Robert and Alexis Rankin, Minors, by Amanda Rankin, Their Mother et al. *v*. The School District of Pittsburgh et al. The School District of Pittsburgh, Pa., The Board of Public Education of The School District of Pittsburgh, and Jerry C. Olson, Superintendent of the Said School District of Pittsburgh, Appellants.

130

Argued November 2, 1977, before President Judge Bowman and Judges Crumlish, Jr., Wilkinson, Jr., Rogers and Blatt.

*Persifor S. Oliver, Jr.,* Assistant Solicitor, with him *Justin M. Johnson,* Solicitor, and *Robert J. Stefanko,* First Assistant Solicitor, for appellants.

*Conrad A. Johnson,* with him *James E. Mahood, Mark Senick,* and *Thomas C. Reed,* for appellees.

OPINION BY JUDGE WILKINSON, JR., December 19, 1977:

In *Hayes v. School District of Pittsburgh,* 33 Pa. Commonwealth Ct. 71, 381 A.2d 193 (1977), we considered a petition to intervene by parents of public school children in a class action brought by other school children against the appellants. We are now asked to deal with the merits of the principal suit and the propriety of the issuance of an injunction in that case.

## I.  FACTUAL BACKGROUND

Homewood-Brushton is a section of the city of Pittsburgh located in the northeast portion of the city, the residents of which are almost entirely black. The School District of Pittsburgh (District), whose boundaries are coterminous with the boundaries of the city, has an established policy of assigning students to neighborhood schools despite an order of the Pennsylvania Human Relations Commission (Commission) issued in 1972, affirmed by this Court and the Supreme

Court of Pennsylvania, ordering the District to eliminate racial imbalance in its schools by the reassignment of students.[1] Prior to the 1975-76 school year, children who lived in Homewood-Brushton and attended Pittsburgh public schools were assigned to six neighborhood elementary schools, each with an enrollment of more than 99% black. One of these schools, formerly Baxter Elementary School (Baxter), is the focus of the present dispute. Upon reaching the eighth grade these elementary students were assigned, prior to the fall of 1975, to Westinghouse High School, also located in Homewood-Brushton, also with an enrollment of over 99% black. In the spring of 1975 the District, in an attempt to resolve discipline problems at Westinghouse High School recommended to the Board of Public Education of the School District (Board) that Baxter be converted into a middle grade center at an estimated cost of $800,000 to $900,000. Thereafter the Board established an ad hoc committee to review discipline problems in the District as a whole, which recommended to the Board on June 24, 1975 that Baxter be converted to a middle grade center to house eighth grade students previously assigned to Westinghouse High School and seventh grade students who would have attended the six elementary schools in Homewood-Brushton. Elementary students previously assigned to Baxter were to be reassigned to the other elementary schools in Homewood-Brushton. This recommendation was approved on the same date and the Board subsequently awarded contracts in the amount of $61,265.00 for general construction to upgrade the elementary school into a middle grade center. At the

---

[1] See *Philadelphia School District v. Human Relations Commission*, 6 Pa. Commonwealth Ct. 281, 294 A.2d 410 (1972, *aff'd sub nom.*, 455 Pa. 52, 313 A.2d 156 (1973) (the school districts of Philadelphia and Pittsburgh did not join in the petition for allocatur).

same time the Board was planning to convert Baxter into a middle grade center for the fall of 1975, the Board was also planning to open the Florence Reizenstein Middle School (Reizenstein), a newly-constructed facility on the boundary of Homewood-Brushton and the Point Breeze-Squirrel Hill area (both predominantly white). Reizenstein, unlike Baxter, was opened on an open enrollment or voluntary basis. However, the Board set racial quotas in accepting students for Reizenstein to achieve a student ratio of 58% white and 42% black, in accordance with the Commission's requirement that the composition of the student body conform to the racial composition of the District as a whole. Because of this racial quota only half of the black students who applied were accepted at Reizenstein. Those who were not accepted were assigned to Baxter or one of the Homewood-Brushton elementary schools.[2]

In August of 1975 several students who lived in Homewood-Brushton and expected to be assigned to Baxter filed a class action against the District and its superintendent seeking to enjoin the opening of Baxter as a middle grade center. After a preliminary hearing, the parties agreed to court-supervised negotiations in an attempt to resolve their differences. These negotiations continued throughout most of the school year. When it appeared the parties were unable to reach a settlement the Court below filed an adjudication and decree on March 1, 1976 which ordered Baxter closed as a middle grade center, the reassignment of its students to 12 designated schools, and directed the Board to either begin construction of a middle grade center at the present site of Sunnyside Elementary School

---

[2] As a middle grade *center*, Baxter housed students in grades seven and eight. As a middle grade *school*, Reizenstein housed students in grades six through eight.

(Sunnyside) or the submission of a reorganization plan to desegregate its schools to the court within 30 days. In its conclusions of law the court found that when appellants opened Baxter knowing it would result in a segregated school this constituted both a violation of the Fourteenth Amendment of the United States Constitution and an Amended Final Order of the Commission, dated September 25, 1972 which barred the Board from opening any new school without a racially-balanced student enrollment.

Exceptions were filed to the adjudication on March 12, 1976 and on April 5, 1976 parents of students of Sunnyside filed a petition to intervene in the case. This petition was denied by the court below on July 2, 1976. *See Hayes v. School District of Pittsburgh, supra.* A final hearing on a permanent injunction was held on July 13, 14 and 15, 1976. On July 28, 1976 the court below issued a final decree ordering Baxter closed as a middle grade center, the reassignment of students to certain designated schools and either the construction of a middle grade center at Sunnyside by September, 1978, or the submission of a reorganization plan to desegregate the District's schools within 15 days of the order.

## II. LEGAL ANALYSIS

This appeal concerns the remedial relief encompassed in the decree of the chancellor. We will consider the issues raised by the appellants *seriatim*.

Appellants first contend that a decree in the form of a mandatory injunction should not have been entered because the record does not show that appellants abused their discretion or acted in an arbitrary or capricious manner. It is true, as appellants suggest, that a mandatory injunction, because it commands a de-

fendant to act, rather than merely prohibits him from acting, should be granted more sparingly than an injunction that is prohibitory. Where a court of equity is asked to provide mandatory injunctive relief in school matters, our Supreme Court has held that such relief may be granted only where there is a clear abuse of discretion or error of law. *Chester Township School District v. Chester School District*, 418 Pa. 294, 210 A.2d 501 (1965). In its adjudication, the chancellor found that by creating Baxter as an all-black school the appellants violated the guidelines of the Commission and the Amended Final Order of the Commission dated September 25, 1972 which barred the district from opening a new school with a racial balance in excess of the guidelines established by the Commission. As was noted by our Supreme Court in *Uniontown Area School District v. Pennsylvania Human Relations Commission*, 455 Pa. 52, 313 A.2d 156 (1973), the guidelines and orders of the Commission are a product of the legislative rule-making power of the Commission granted by the Legislature in Section 7 of the Pennsylvania Human Relations Act (Act), Act of October 27, 1955, P.L. 744, *as amended*, 43 P.S. §957 and its rules and regulations are therefore as valid and binding upon a court as a statute. In our view, the force of reasoning in *Uniontown, supra,* leads to the conclusion that by opening Baxter, the Board was in violation of Section 5(i)(1) of the Act as defined by the rules and regulations of the Commission for which equity could provide a remedy.

It should be noted that the action of the Board here is not analogous to cases cited by appellants where injunctive relief was refused because the requested relief involved a matter in which the legislature had vested a discretionary power in school boards. *See Zebra v. Pittsburgh School District,* 449 Pa. 432, 296

A.2d 748 (1972). Although the assignment of students to particular schools is generally a matter within the discretionary powers of school boards, according to *Uniontown, supra,* a school board, subject to an order of the Commission, does not have the legal discretion to create a segregated school. Accordingly, we find it was proper for the court to have decreed mandatory injunctive relief.

Appellants next contend that even given a constitutional or statutory violation, the remedy decreed by the chancellor was improper.[3] We agree with appellants that the decree fashioned by the chancellor contained remedies that were excessive in nature and scope and that therefore the decree must be vacated.

In testing the appropriateness of judicial remedies with respect to the myriad and complex problems of school desegregation we are guided by the Supreme

---

[3] In the chancellor's adjudication, the court also concluded that by opening Baxter as an all-black middle grade center the appellants violated the Fourteenth Amendment of the United States Constitution. Where segregation is "de facto," rather than "de jure," the Fourteenth Amendment prohibits only intentionally discriminatory acts. *Keyes v. School District No. 1, Denver, Colorado,* 413 U.S. 189 (1973). In turn the remedy for such action by school officials must be limited to the segregative effect of such action measured against the racial distribution had there been no official school action. *Dayton Board of Education v. Brinkman,* U.S. , 97 S.Ct. 2766 (1977). Appellant argues that since the students assigned to Baxter were previously assigned to neighborhood schools that were also predominantly black there was no additional segregative impact on the racial distribution in Pittsburgh schools. Since we find a private litigant may seek compliance with the Pennsylvania Human Relations Act, guidelines and orders of the Commission, *see* Section 12(b) of the Act, 43 P.S. 962(b); *Everett v. Harron,* 380 Pa. 123, 110 A.2d 383 (1955), we need not decide the constitutional issues presented in this appeal. Although the Commission has not sought enforcement of its order with this Court and the District has pending an appeal with our Supreme Court, we believe private parties could nonetheless seek enforcement of the order.

Court's rule in *Swann v. Charlotte-Mecklenburg Board of Education,* 402 U.S. 1, 16 (1971) that "the nature of the violation determines the scope of the remedy." In fashioning remedies to correct unlawful segregation, the Court, through Mr. Chief Justice BURGER, admonished courts of equity must balance the public interest and private needs, mindful that "[r]emedial judicial authority does not put judges automatically in the shoes of school authorities whose powers are plenary." *Id.*

In ordering Baxter closed as a middle grade center the chancellor properly addressed the wrongful act of the Board, the violation of the Commission's order by opening the school without assuring a racially-balanced student enrollment. This order was amply supported by findings of fact regarding the student enrollment at Baxter and the order of the Commission. The chancellor further ordered, however, that students previously assigned to Baxter be reassigned to 12 designated schools. We note initially that the chancellor made no findings of fact with regard to the racial balance of student enrollment at these schools as required by Pa. R.C.P. No. 1517(a). But we are constrained to add that the record, including detailed student census records supplied by the appellants, shows that five of the schools designated by the chancellor to receive the reassigned Baxter students had ratios of black students enrollment far in excess of the guidelines established by the Commission to achieve racial balance.[4] As noted by the Supreme Court in *Swann, supra,* a court of equity may properly take affirmative action

---

[4] The black enrollment at these schools were as follows: Frick, 94.5%; Herron Hill, 99.4%; Holmes, 59.2%; Lemington, 99.2%; Rogers, 76.1%. In addition three other of these designated schools had black enrollments above the black enrollment of 42% for the school district as a whole but within the guidelines established by the Commission.

in the form of altering attendance zones, but it may do so only to the extent that truly non-discriminatory, and, hence, racially balanced, student assignments are achieved. The record clearly supports the conclusion that the order of the chancellor in reassigning students would have precisely the opposite effect. Absent facts in the record not apparent to us and proper findings of fact by the chancellor, we conclude this "affirmative action" was outside the power of a court of equity to decree.

We next turn to that portion of the chancellor's decree which ordered the appellants to:

> [I]mmediately either commence the construction of a facility at the location of the present Sunnyside [Elementary] School, exercising all due diligence so that the same may be completed on or before September 1978, which facility shall be equal in both physical plant and educational programing to other middle schools operated by the defendants, or, in the alternative, submit a plan of reorganization to the Court within fifteen (15) days from the date here of.

It was clearly within the power of a court of equity to order the submission of a plan that would have established a racially-balanced middle grade center or school to which the former students of Baxter Middle Grade Center would thereafter attend. *See Swann, supra.* We do not believe, however, that a court of equity has power to order the construction of a new facility as a remedy to correct racial imbalance.

Section 701 et seq. of the Public School Code of 1949 (Code), Act of March 10, 1949, P.L. 30, 24 P.S. §7-701 et seq. grants local school boards broad powers to select property and construct school buildings and Section 1310 of the Code, 24 P.S. §13-1310, grants

boards broad powers to assign students to schools within each district. As previously noted this discretionary power has been specifically limited by the legislature through the enactment of the Pennsylvania Human Relations Act and regulations of the Commission authorized by the Act. In its Amended Final Order of September 25, 1972, the Commission only prohibited the Board from opening any new school without a racially balanced enrollment and further impliedly recognized the discretionary power of the Board to select sites by requiring this data be submitted to the Commission in seeking approval of building project. Further, we find nothing in the Act itself or the rules and regulations of the Commission to indicate that this historic power of school boards has been abrogated, or suggesting that a court of equity in enforcing an order of the Commission may intervene by substituting its judgment as to the site for a new school for that of the school board.

Additionally, the chancellor's decree with respect to Sunnyside must be vacated for failure to comply with Pa. R.C.P. No. 1517(a).[5] That rule requires that a decree be accompanied by an adjudication containing "all the facts which are necessary to be known in order to determine the issues." The chancellor's findings of fact contain no reference to Sunnyside, particularly the feasibility of constructing a new school or the racial composition of its enrollment. Such findings are mandated by Pa. R.C.P. No. 1517(a) and where

---

[5] The rule provides:

The adjudication shall consist of (1) a statement of the issues; (2) a closely condensed chronological statement, in narrative form or in separate findings, of all the facts which are necessary to be known in order to determine the issues; (3) a discussion of the questions of law involved and the courts conclusions of law and (4) a decree nisi.

Pa. R.C.P. No. 1517(a).

140

such findings are general or non-existent the decree must be vacated. *Stryjewski v. Local Union No. 830*, 451 Pa. 550, 304 A.2d 463 (1973).

Accordingly, we will enter the following

ORDER

AND Now, December 19, 1977, the decree of the Court of Common Pleas of Allegheny County, No. G.D. 75-19178, dated July 28, 1976, is hereby vacated and the record remanded to the trial court to conduct an evidentiary hearing consistent with our opinion in *Hayes v. School District of Pittsburgh*, 33 Pa. Commonwealth Ct. 71, 381 A.2d 193 (1977) and to make findings of fact and conclusions of law and modify its decree consistent with any additional testimony and with this opinion.