**PENNSYLVANIA HUMAN RELATIONS COMMISSION, Petitioner,**

v.

**SCHOOL DISTRICT OF PHILADELPHIA, Respondent,**

and

**Harry and Annemarie Gwynne, Aspira of Pennsylvania, Intervenors.**

Commonwealth Court of Pennsylvania.

Decided Jan. 6, 1995.

---

Michael Hardiman, Asst. Chief Counsel, for petitioner.

William H. Brown, III, for respondent.

Michael Churchill and Patricia A. Lowe, for intervenors.

SMITH, Judge.

The School District of Philadelphia filed a partial appeal of the Court's November 28, 1994 order to the Pennsylvania Supreme Court. The order required the School District to take steps to eliminate the racial disparities in academic achievement and educational opportunities among students attending Philadelphia public schools. The School District has applied to this Court for a partial stay of that order. The instant opinion disposes of the School District's application and together with prior opinions[1] contain the reasons for the Court's remedial order.

## I.

### Stay Request

The School District seeks a stay of paragraphs 5, 13, 14, 26, 28, 29, 30, 32 and 39 of the November 28, 1994 order, which include remedial measures aimed at eliminating the discrimination found to exist in the public schools.

The School District requests a stay of the requirements to provide full-day kindergarten to all eligible Black and Hispanic students by September 1995 and all eligible students by September 1996; eliminate prolonged disruption in learning at the beginning of each school year, reduce school leveling and provide textbooks and other necessary supplies and equipment at each school; assign qualified substitutes in racially isolated schools and develop incentives to attract a greater percentage of experienced teachers in those schools; reduce the high absenteeism rates and reinstate truant officers to combat absenteeism; restructure operations to foster decision making at the school level; develop an equity assurance office, professional development center and recruitment and educational counselling services for students; retain the regional structure to provide supervision and control over school-based management efforts; and maintain and repair racially isolated schools. The School District's jurisdictional statement indicates that it also appeals the Court's requirement for reduced class size.

## II.

### (a)

■ An applicant for a stay of proceedings bears the burden to establish the elements necessary for the grant of a stay. The applicant must make a substantial case on the merits of the appeal, demonstrate that without the requested relief the applicant will suffer substantial injury, a stay will not substantially harm other interested parties in the proceedings, and a stay will not adversely affect the public interest. *Pennsylvania Public Utilities Commission v. Process Gas Consumers Group*, 502 Pa. 545, 467 A.2d 805 (1983). These criteria require the Court to balance the interests of all parties and the public where applicable and demand that an applicant show a legally sustainable probability of success in its appeal. Where the reviewing court determines that the standards for a stay have not been satisfied by the applicant, the request for stay shall be denied. *Id.*

The School District has not appealed the Court's findings of racial disparities in academic achievement and educational opportunities or that the School District maintains a de facto segregated public school system. Instead, the School District appealed the very essence of the Court's order to remedy the racial disparities found to exist and to bring about equality in education. The School District has elected to continue this 24–year litigation at the expense of children caught in the grips of a system where segregation and racial disparity is pervasive and overwhelming. Because the School District has failed to satisfy even one of the elements

---

1. The history of this case is fully set forth in the Court's opinion filed February 8, 1994 in *Pennsylvania Human Relations Commission v. School District of Philadelphia (HRC VI)*, 161 Pa.Commonwealth Ct. 658, 638 A.2d 304 (1994), and opinion and order in *Pennsylvania Human Relations Commission v. School District of Philadelphia (HRC VII)*, —— Pa.Commonwealth Ct. ——, 651 A.2d 186 (1994).

for the grant of a stay, its application is denied.

■ State courts are not precluded from remedying de facto segregation under state law. Pennsylvania Human Relations Act, Act of October 27, 1955, P.L. 744, *as amended*, 43 P.S. § 962(a); *Pennsylvania Human Relations Commission v. Chester School Dist.*, 427 Pa. 157, 233 A.2d 290 (1967); *Uniontown Area School Dist. v. Pennsylvania Human Relations Commission*, 455 Pa. 52, 313 A.2d 156 (1973); *Bd. of Educ. of Englewood Cliffs v. Bd. of Educ. of Englewood*, 257 N.J.Super. 413, 608 A.2d 914 (1992), *aff'd*, 132 N.J. 327, 625 A.2d 483, *cert. denied*, —— U.S. ——, 114 S.Ct. 547, 126 L.Ed.2d 449 (1993). In *Chester School Dist.*, the Pennsylvania Supreme Court imposed the duty on school districts to provide equal educational opportunity to all students and to initiate remedial programs to overcome the effects of discrimination.

In *Milliken v. Bradley*, 433 U.S. 267, 97 S.Ct. 2749, 53 L.Ed.2d 745 (1977), the U.S. Supreme Court upheld the right of courts to order educational programs and improvements to remedy the effects of segregation and stated that where school authorities fail to satisfy their affirmative obligations, judicial authority may be invoked.[2] In *Swann v. Charlotte–Mecklenburg Board of Education*, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971), the Supreme Court stated that in equity actions, the relief must fit the violations found and the purpose of a remedial decree in school desegregation cases is to correct the violations and to eradicate their effects.

■ The Court clearly possesses equitable powers and authority to order the School District to remedy the unequal treatment of students and to take necessary steps to eliminate conditions found to exist. *See HRC VI.* The suggestion that the Court has no authority to order a remedy, or that the Court's order co-opts the School District's authority or micro-manages its affairs, reflects the latest in a series of spins calculated to obscure the fundamental issue before the Court and the public: the decades-long recalcitrance of the School District to fully educate the children attending racially isolated schools. Where the School District has refused to satisfy its affirmative obligation to these children, judicial authority must be invoked.

The Court conferred substantial latitude and responsibility upon the School District to develop the specifics of an acceptable plan to be submitted by February 15, 1995 and imposed no educational remedies not supported by the record. The Court framed an order incorporating feasible recommendations contained in the educational plan submitted to the Court on September 15, 1994, expert testimony presented throughout the proceedings, and testimony of the Superintendent who originally agreed to particular educational remedies now under attack. The Court further incorporated ordinary functions of the school board required by the Public School Code of 1949, Act of March 10, 1949, P.L. 30, *as amended*, 24 P.S. §§ 1–101—27–2702 (e.g., purchase of necessary textbooks and supplies, proper maintenance and repair of all schools, employment of truant officers to enforce compulsory school attendance laws, and employment of professional staff).

(b)

■ Educational experts, including those offered by the School District, universally

---

**2.** In *Milliken,* the remedial order required, inter alia, institution of reading and communications skills programs, in-service professional training, revised student testing programs, appropriate human relations programs, and guidance and counselling programs to restore the affected students to a position they would have enjoyed but for the constitutional violations. In *Evans v. Buchanan,* 582 F.2d 750 (3d Cir.1978), the court ordered broad remedial measures to remedy segregation including but not limited to school building construction, review of existing facilities needs, development of standards of conduct, in-service professional training, institution of reading and communication skills programs, curriculum development which reflected cultural pluralism of the students, and reassignment of staff to eliminate racial disparity. In *Rankin v. School District of Pittsburgh,* 33 Pa.Commonwealth Ct. 129, 381 A.2d 195 (1977), this Court recognized that in equity actions, courts may fashion appropriate remedial measures to correct the violations found and that "the nature of the violation determines the scope of the remedy." *Id.,* at 137, 381 A.2d at 199 (citing *Swann,* 402 U.S. at 16, 91 S.Ct. at 1276).

agree that providing increased resources and enhanced focus and intervention in early childhood development and learning produces substantial outcomes in terms of student achievement and academic success. The consequences of prolonging the institution of full-day kindergarten, particularly to students in the racially isolated schools, are immeasurable and a stay of the order will substantially harm their interests. The record further amply demonstrated that students in racially isolated schools, and others, lose substantial periods of learning and suffer the consequences of disruption occurring at the beginning of each school year due to the District's failure to provide adequate teaching personnel and class rostering.

The School District's failure to provide resources in racially isolated schools on an equal basis, trained and properly certificated substitutes, greater percentages of experienced teachers, smaller class sizes, and other vital supports for those schools to effectively function negate any contention that the School District has made out a substantial case on the merits of its appeal. The remaining items appealed by the School District, if implemented in conjunction with those mentioned above, would substantially equalize educational opportunities and create a system where all children are at a minimum given a chance to obtain a quality education.

(c)

■ Other School District claims concern the Court's limitations on organizational re-structuring related to the transfer of fiscal control and management over School District funds to local school councils, transfer of the power to hire and fire personnel, and elimination of the regional offices.

The Superintendent's proposal to transfer school funds and personnel authority to local school councils presents the potential for massive fiscal control and accountability issues, corruption, fraud and patronage. Moreover, the transfer of fiscal control and management to local school councils has not been endorsed in this record by any of the parties to the action, nor by teachers and administrators. In fact, the Philadelphia Federation of Teachers expressly stated in its response to the educational plan that the School District should carry its responsibility to provide educational standards, and allotments and resources to meet those standards so that teachers and parents may concentrate on methods and curriculum.[3] The School District has failed to demonstrate a basis for this proposal or a nexus between the transfer of fiscal and personnel control and the improvement of academic achievement.

Presently, the Superintendent and school board members can be held accountable by law in their fiduciary capacity for the expenditures of taxpayer funds to operate the schools. 24 P.S. § 6–608.[4] No compatible accountability would exist in the proposed local school councils if funds were not expended in an appropriate or authorized manner. The School District does not suggest a

---

3. The transfer of fiscal and personnel control is further contraindicated by reports of activities found in comparable urban school districts operating under some form of school reform legislation. *See* Report of the City of New York, Special Commissioner of Investigation for New York School District, From Chaos to Corruption, December 1993 (election of community school boards found captive to select group of political insiders, patronage mills created, and educational priorities given backseat to political imperatives). Studies of the Chicago decentralization effort show that improvement in academic achievement has not yet been effected and school-based management has not produced the anticipated educational climate. Putting Learning First, Committee for Economic Development, New York, N.Y., 1994; U.S. Department of Education Report on School–Based Management—

The Changing Focus of Control in American Public Education, February 1994.

The general equivalent in the New York School system to the local school council is the community board which possesses specific powers and authorities granted by legislation. N.Y.Educ. Law §§ 2590—2590–p; school reform legislation in Illinois established local school councils which possess discretion to manage and use certain school funds. *See* generally 1990 Ill.Laws 1477, Section 18–8(5).

4. The School Code also mandates that school boards of districts of the first class shall determine and direct all expenditures for the maintenance and improvement of the school system, and shall purchase all necessary furniture, equipment, textbooks, supplies and other appliances for public schools. 24 P.S. §§ 8–801, 21–2103.

remedy if local school councils fail to audit their funding, to pay contractors and vendors, to purchase books and supplies, or to otherwise account for public funds. Nor does the School District suggest what recourse may be available to parents and students if local school councils neglect or fail to purchase needed equipment or supplies.

Turning to the Superintendent's proposal for local school councils to hire and fire school personnel, the School District simply fails to recognize that school operations are governed by the School Code which provides a statutory scheme for the hire and discharge of professional employees. Absent a legislative amendment to the School Code, the School District may not relinquish its personnel hiring and firing authority to local school councils. The School Code mandates that school boards maintain eligibility lists from which to hire professional employees, prescribes procedures for the suspension and discharge of professional employees and for the conduct of public hearings in the event of discharge, and other statutory procedures for the maintenance of school personnel. *See HRC VII.* As indicated in the November 28 opinion and order, the School District shall provide, however, a mechanism for local school councils to participate in personnel decisions affecting their school.

As to the elimination of regional offices, the Court expressed concern that the School District's proposal would foster more than 250 separate school operations within the School District without any mechanism in place for oversight and control. At argument on the School District's stay application, the Court made clear that the School District has discretion to label or identify the regional office structure in whatever manner it sees fit but that a structure must be in place to supervise school-based management efforts. Nothing in the order disrupts the School District's planning process and decentralization efforts or prohibits a more efficient administrative structure. Consequently, a stay of the order is unwarranted because the School District's efforts at restructuring have not been unduly restricted by the Court.

### III.

■ The School District also appealed the Court's failure to join the Commonwealth of Pennsylvania as a funding source. The appeal on this ground is totally devoid of merit and provides no basis for the grant of a stay. In the November 28 opinion and order, the Court specifically modified an earlier ruling and indicated that the parties may renew their motions for joinder at such time as the Court is presented with an acceptable plan to eliminate the discriminatory conditions found to exist within the public schools, the School District establishes economies through an independent audit and identifies additional available funds, and the School District presents realistic cost projections for implementing the Court's order. It is inconceivable that the School District should demand joinder of the Commonwealth when the School District has failed to satisfy requirements of the Court's order or presented, on the record, an accurate assessment of any additional funds needed to implement the order.

In an opinion issued 22 years ago, this Court responded to the School District's "lack of funds" defense to desegregating the schools:

> The Court is very sympathetic with the position of the School Districts that it is futile to require the districts to submit plans that would meet the minimum requirements of the Commission when the increased costs incident to such plans, i.e., busing, installation of cafeterias, lunch programs, etc., are beyond the financial capabilities of the Districts. *However, the costs cannot be determined with any accuracy until a minimum acceptable plan is submitted. Whether it can be implemented within the financial capabilities of the Districts, together with such support from other sources as can be generated and with any realignment of priorities, will have to be determined at that time.* (Emphasis added.)

*School District of Philadelphia v. Pennsylvania Human Relations Commission (HRC I),* 6 Pa.Commonwealth Ct. 281, 287, 294 A.2d 410, 413 (1972), *aff'd,* 455 Pa. 52, 313 A.2d 156 (1973).

The School District may not be relieved of its obligations to remedy the discrimination found to exist by pleading 24 years of poverty. *Evans; Pennsylvania Human Relations Commission v. School District of Philadelphia (HRC II),* 23 Pa.Commonwealth Ct. 312, 352 A.2d 200 (1976).[5] Nor may the School District be relieved of its obligations to remedy the offending conditions on a record which establishes a pervasive pattern of unequal allocation of funds, an historical indifference toward racially isolated schools, and a refusal to allocate sufficient funds to remedy conditions found in those schools. Thus the School District will suffer no injury by the Court's refusal to grant a stay. The School District cannot claim injury due to the Court requiring it to satisfy obligations imposed by law.

◼ The School District has failed to make a substantial case on the merits of its appeal, to demonstrate that it will suffer substantial injury without the stay, to show that the requested stay will not substantially harm interested parties, and that a stay will not adversely affect the public interest in providing equal educational opportunity to all public school students. The School District's request for a stay is consequently denied. It is incumbent upon the courts of this Commonwealth to end the School District's 24 years of stonewalling and claims of fiscal inability to educate the racially isolated school students, and to order the School District to finally satisfy its legal obligations to these children.

### ORDER

AND NOW, this 6th day of January 1995, the application for partial stay of the Court's November 28, 1994 order is hereby denied.

---

**5.** While the educational plan purports to frame cost projections of $300 million, this figure included items not ordered by the Court and does not fully reflect the amounts which may be available from existing School District funds. The Court further noted in the November 28 opinion and order that the School District's cost projections lack credibility and required substantial revision.