467 A.2d 805

**PENNSYLVANIA PUBLIC UTILITY COMMISSION, Appellant,**

v.

**PROCESS GAS CONSUMERS GROUP, Appellee.**

Supreme Court of Pennsylvania.

Argued May 25, 1983.

Decided Aug. 23, 1983.

546

James P. Melia, Lee E. Morrison, Daniel P. Delaney, Charles F. Hoffman, Middletown, for petitioner.

Stephen A. George, Geen S. Howard, Pittsburgh, for respondent Process Gas Consumers Group.

Maurice A. Frater, Harrisburg, for Carnegie Natural Gas.

Martha W. Bush, Harrisburg, for Office of Consumer Advocate.

Robert E. Kelly, Jr., Harrisburg, for Hospital Assn. of Pa.

Rodney G. Hoffman, John Winship Read, Pittsburgh, for Allegheny Ludlum Steel Corp.

Before ROBERTS, C.J., and LARSEN, FLAHERTY, McDERMOTT and ZAPPALA, JJ.

## OPINION

LARSEN, Justice.

In 1978, the United States Congress enacted into law the Natural Gas Policy Act of 1978 (NGPA).[1] Under the provisions of the NGPA the Federal Energy Regulatory Commission (FERC) is charged with the duty of prescribing and making effective an incremental pricing plan designed to provide for the passthrough of the costs of natural gas incurred by federally regulated interstate pipelines.[2] The NGPA mandates incremental pricing of natural gas to industrial boiler fuel facilities where the boiler fuel use[3] of

1. Act, Nov. 9, 1978, P.L. 95–621, § 1, 92 Stat. 3350; 15 USCS §§ 3301, et seq.

2. Nov. 9, 1978, P.L. 95–621, Title II, § 201, 92 Stat. 3371, 15 USCS § 3341.

3. "Boiler fuel use" is defined in the Act as "the use of any fuel for the generation of steam or electricity."

natural gas exceeds 300,000 cubic feet a day. This statutory scheme provides for certain exemptions,[4] and it does not apply to industrial consumers whose natural gas use is in non boiler fuel uses.

The operation of the incremental pricing plan established by the NGPA was succinctly explained in the opinion and order of the Pennsylvania Public Utility Commission (PUC) adopted on August 13, 1982 and entered on November 3, 1982 from whence this appeal comes.

In essence, NGPA requires that interstate pipelines and local distribution companies pass through certain portions of their total natural gas acquisition costs to non-exempt industrial users (large industrial facilities which burn natural gas for boiler fuel use), in the form of surcharges. These surcharges plus the standard tariff charges constitute the "incremental" price of gas to such customers. These surcharges may not, however, raise the ultimate cost of gas, to the user, above the cost of fuel oil which could be used as an alternative to natural gas.

Federal regulations provide the framework for calculation and billing of incremental pricing surcharges to customers subject to the incremental pricing program. The basic mechanism of incremental pricing contained in those regulations is a reduced "purchased gas cost adjustment rate" (PGA), which will operate as follows:

The Federal Energy Regulatory Commission (FERC) has established a gas price which will be an "incremental pricing threshold." Each interstate pipeline will be required to file a revised PGA tariff. Prior to filing that tariff, each pipeline will estimate the total gas acquisition costs it expects to incur in the prospective period to which the revised PGA tariff will apply. The estimated total gas acquisition costs which exceed the "incremental pricing threshold" price will be recorded in an unrecovered incremental gas cost account. These costs will be recovered by surcharges to non-exempt large industrial boiler

4. Nov. 9, 1978, P.L. 95–621, Title II, § 206, 92 Stat. 3379, 15 USCS § 3346.

fuel facilities. The estimated total gas acquisition costs *equal to or less than* the "incremental pricing threshold" price will be incorporated in the new PGA, which will consequently be a reduced amount. In other words, the price difference between a basic charge for gas and the estimated total gas acquisition cost would be normally recovered by operation of the PGA tariff rates. That difference will now be divided into two groups, one of which will be the new, smaller PGA tariff rate, and one of which will form the basis of the surcharge to the facilities subject to the "incremental" pricing program. (It should be noted that the new PGA tariff rate may actually be higher than historical PGA rates, but it will still be smaller than a PGA rate which would reflect *all* gas acquisition costs.)

The pipeline will then file its "reduced PGA" rate with FERC and use this rate for the applicable PGA period. As a result, there will be a flow-through of estimated benefits of incremental pricing to residential, commercial and small industrial customers, since their gas rates will reflect the pipeline's reduced PGA rate.

Under the regulations, the gas costs accumulated in the incremental pricing gas cost account of each pipeline system would be spread among distributing utilities and other pipelines which receive gas from that pipeline for non-exempt industrial customers. The rate of collection would be based upon the "maximum surcharge absorption capability" (MSAC) of each non-exempt industrial user. The MSAC consists of the difference between the price or rate such non-exempt users currently pay for natural gas and the alternate fuel price of No. 6 high sulfur fuel oil multiplied by the volume of usage. The distribution utilities report their aggregate MSAC's to their respective pipeline supplier for allocation of incremental pricing surcharges and collect the final surcharge levied by the pipeline. If gas utilities have a tariff providing rates, for gas and customers subject to the incremental pricing program, which are equivalent to the ceiling price of such

gas, such customers would have no surcharge absorption capability. Therefore, the distribution utilities would report an aggregate MSAC of *zero* to their respective pipeline suppliers. This means that none of the incremental pricing accounts will be assigned to any such distribution company.

In response to the plan of NGPA, the PUC adopted a scheme of its own, to keep incremental price surcharge revenues within Pennsylvania. The PUC established a "Boiler Fuel Rider" (BFR) which is a surcharge to be added to the base industrial rates charged by Pennsylvania gas utility companies to large industrial users for boiler fuel application. The BFR surcharge was set at an amount necessary to bring the base gas rate up to the price for residual fuel oil. As a consequence of this BFR surcharge, the Pennsylvania gas utilities could report "zero" MSAC to the interstate pipeline suppliers. This result would have two effects: (1) The Pennsylvania gas utility companies and their non-exempt customers would avoid bearing any share of the interstate pipelines' incremental gas cost accounts, and (2) the additional surcharge revenues generated would not have to be shared with consumers in other states.

In the commission order adopted August 13, 1982 and entered November 3, 1982, the PUC directed that each affected gas utility company submit a proposed residential conservation program to be funded by the BFR revenues which had accumulated as of August 13, 1982. Further, it was ordered that BFR monies generated after August 13, 1982 shall be held in a segregated interest-bearing escrow account for future disposition by order of the PUC.

On December 1, 1982, the Appellee, Process Gas Consumer Group (PGCG),[5] whose members engage in both exempt and

5. Process Gas Consumers Group (PGCG) is an association of industrial consumers of natural gas which own and operate facilities in virtually every state of the United States, including Pennsylvania. PGCG participates in regulatory and judicial proceedings through *ad hoc* committees. The members of the committee participating in this case are: American Standard, Inc., Armco, Inc., Bethelehem Steel Corporation, Borg-Warner Corporation, Cone Mills Corporation,

non-exempt use of natural gas, filed with the PUC a motion for a stay of the November 3, 1982 order pending judicial review. On December 3, 1982, appellee filed a timely petition for review in the Commonwealth Court. On January 7, 1983, the PUC entered an order denying appellee's motion for a stay. Appellee then pursued its application for a stay, which had been filed along with the petition for review, in the Commonwealth Court. Following oral argument on the stay application, the Commonwealth Court by order of January 28, 1983, granted the requested stay. It is from this order that the appellant PUC appeals to this Court.

The appellant argues that the Commonwealth Court applied erroneous standards in granting appellee's request for a stay. Appellant argues further that even applying the correct criteria, under the circumstances of this case, a stay is not warranted and the Commonwealth Court's order should be reversed and the stay vacated.

In granting the stay, the Commonwealth Court entered the following memorandum and order:

Petitioner seeks a stay of respondent's order entered November 3, 1982 which directs certain gas utilities to develop plans for residential energy conservation programs to be funded by Boiler Fuel Rider tariffs. It appearing that the standard for such a stay as set forth in *Allets, Inc. v. Penn Township Board of Supervisors,* 67 Pa. Commonwealth Ct. 326, 447 A.2d 329 (1982), has been met, we enter the following

Now, January 28, 1983, upon consideration of petitioner's application for stay and respondent's answer thereto, and after oral argument and review of supporting memoranda, the application for stay is granted.

In *Allets, Inc. v. Penn Township Board of Supervisors, supra,* the Court held:

[A] stay or supersedeas should be granted only

1. If the appeal appears to present a question which is meritorious, not frivolous;

General Motors Corporation, National Gypsum Company, and United States Steel Corporation.

2. If any detriment to interested parties resulting from a stay would be less than the harm resulting from a denial of it; and

3. if the public interest would not be adversely affected by a stay.

The appellant contends, and we agree, that the criteria set forth in the *Allets* decision provides standards wholly inadequate for a court to decide a request for a stay of a governmental order. The requirement that the appeal appear to present a question which is "not frivolous" is hardly a meaningful standard. This criterion would be satisfied in the overwhelming majority of appeals. It is quite the exception when an appeal is deemed to appear frivolous. Further, if indeed an appeal is found to be frivolous, then the appeal itself should be dismissed, rendering the question of a stay moot. It would follow then that if an appeal is not a bona fide candidate for dismissal because of it being addressed to frivolous matters, the initial *Allets* standard for the issuance of a stay has been met. Realistically, this has the effect of eliminating the first criterion as a standard beyond that which is traditionally required to ethically file an appeal. We then are left with the second and third criteria announced in *Allets* as the only standards which a court must follow in granting or denying an application for a stay. We cannot approve of such a rule.

Prior to the *Allets* decision, in a series of unpublished memorandum orders and opinions,[6] the Commonwealth Court adopted and followed the standards set forth in *Virginia Petroleum Jobbers Association v. Federal Power Commission,* 259 F.2d 921 (D.C.Cir.1958). Under the *Virginia Jobbers* Criteria, the grant of a stay is warranted if:

1. The petitioner makes a strong showing that he is likely to prevail on the merits.

6. *Yellow Cab of Pittsburgh v. Pennsylvania Public Utility Commission* (No. 1182 C.D.1979, filed June 26, 1979); *Joseph Horne Co. v. Pennsylvania Public Utility Commission* (No. 1703 C.D.1981, filed July 10, 1981); *Brink's Incorporated v. Pennsylvania Public Utility Commission,* (No. 236 E.D.1982, filed April 28, 1982).

2. The petitioner has shown that without the requested relief, he will suffer irreparable injury.

3. The issuance of a stay will not substantially harm other interested parties in the proceedings.

4. The issuance of a stay will not adversely affect the public interest.

These traditional criteria requiring the court to balance the interests of all parties, and the public where applicable, and requiring the applicant to demonstrate a probability of success on the merits, are favored and followed in the federal circuit courts.[7]

■ An application for a stay pending appeal always involves a situation in which the merits of the dispute have been fully considered in an adversary setting and a final decree rendered. Under these circumstances, it is essential that the unsuccessful party, who seeks a stay of a final order pending appellate review, make a strong showing under the *Virginia Jobbers* criteria in order to justify the issuance of a stay. In *Washington Metropolitan Area Transit Commission v. Holiday Tours, Inc.,* 559 F.2d 841 (D.C.Cir.1977), the District of Columbia Circuit Court refined the *Virginia Jobbers* standards and held:

> [t]hat under *Virginia Petroleum Jobbers* a court, when confronted with a case in which the other three factors strongly favor interim relief may exercise its discretion to grant a stay if the movant has made a substantial case on the merits.

*Washington Metropolitan Area Transit Commission v. Holiday Tours, Inc., supra.* at p. 843.

**7.** *See: Providence Journal Company v. Federal Bureau of Investigation,* 595 F.2d 889 (1st Cir., 1979); *Greene County Planning Board v. Federal Power Commission,* 490 F.2d 256 (2nd Cir., 1973); *Penn Central Transportation Co. (appeal of State of New York),* 457 F.2d 381 (3rd Cir.1972); *Commonwealth of Pennsylvania ex rel. Creamer v. U.S. Department of Agriculture,* 469 F.2d 1387 (3rd Cir.1972); *Long v. Robinson,* 432 F.2d 977 (4th Cir.1970); *Ruiz v. Estelle,* 650 F.2d 555 (5th Cir.1981); *Taylor Diving & Salvage v. U.S. Department of Labor,* 537 F.2d 819 (5th Cir.1976).

▆ We hold that the standards established by the *Virginia Jobbers* court as refined by the *Washington Metropolitan Area* decision provide a rational basis for the issuance of a stay pending appeal and are the criteria to be followed by the courts of this Commonwealth.[8] Accordingly, we find that the Commonwealth Court applied erroneous standards when it relied upon the *Allets* criteria in granting a stay in this case.

▆ Nevertheless, in applying the *Virginia Jobbers—Washington Metropolitan Area* standards to the instant case, the issuance of a stay is justified. The appellee, PGCG, has raised significant legal issues involving an interpretation of the Public Utility Code[9], and has made a substantial case on the merits. Although the realities of the controversy here go to the disposition of money, we believe that there is a sufficient showing of irreparable harm likely to result to the appellee. Without a stay, the surcharge monies accumulated prior to August 13, 1982 may be spent on the conservation project ordered by the Commission. If, after the monies are so spent, it is determined that the Commission had no right to order such a disposition, exempt gas users will have been harmed to the extent that they were deprived of rebates of these funds in the form of lower gas rates for exempt uses. To recover these sums the rates then would have to be set low enough so that appellee would not only

8. The requirement that the applicant for a stay show that it is likely he will prevail on the merits should not be an inflexible rule. This criterion must be considered and weighed relative to the other three criteria. Under Rule 1781 of the Pa.R.A.P., a petition for a stay is to be presented, in the first instance, to the tribunal which rendered the order being challenged. If the likelihood of success on the merits is a rigid standard, then the requirement of seeking the stay in the first instance would be a futile gesture. It is that very tribunal which has just rendered an adverse decision on the merits which would be required to consider the likelihood of success factor. It is extremely unlikely that the lower tribunal will find it likely that its order will be reversed on the merits. On the other hand, there are ample instances where the lower tribunal could find that the applicant has presented a substantial case on the merits even though it disagrees.

9. Public Utility Code, 1978, July 1, P.L. 598 No. 116 § 1, 66 Pa.C.S.A. § 1301, 1304.

enjoy the benefits of lower rates due to current BFR surcharge revenues, but also would recover the surcharge monies which should have lowered rates in the past. The difficulty in this situation is that there is a ceiling on the BFR surcharge, and the regular base rates that may be charged are strictly regulated so that they are justified by the utility companies' costs.[10] As the PUC has failed to explain satisfactorily how full rebates could be effectuated, we believe that, under the circumstances, appellee has made a sufficient showing of a probability of irreparable harm.

We can see no harm befalling the PUC as a result of a stay of its order here. Further, we can find no harm to the public interest resulting from the issuance of a stay under the facts of this case. In addition, both the PUC and the public have an interest in having the substantial legal issues raised by PGCG's appeal decided correctly on the merits.

The PUC's motion to vacate the order of the Commonwealth Court of January 28, 1983 is denied.

NIX, J., did not participate in the consideration or decision of this case.

HUTCHINSON, J., did not participate in the consideration or decision of this case.

ZAPPALA, J., filed a concurring and dissenting opinion.

ZAPPALA, Justice, concurring and dissenting.

While I would concur in the majority's adoption of the standards for granting a stay pending appeal established in *Virginia Petroleum Jobbers Assoc. v. Federal Power Commission,* 259 F.2d 921 (D.C.Cir.1958), and refined in *Washington Metropolitan Area Transit Comm. v. Holiday Tours, Inc.,* 559 F.2d 841 (D.C.Cir.1977), I must disagree to the extent that the application of those standards to the present case warrants the granting of the requested stay.

---

10. For example the utilities could not be required to operate at a loss until exempt users recovered the past surcharge revenue which should have given them a previous rate reduction.

I find no irreparable harm which would be visited upon either the Respondent or the public at large if the stay is not granted.

At the present time, monies generated by the "Boiler Fuel Rider" (BFR) after August 13, 1982 are being held in escrow pending the submission of proposals by each affected gas utility company on a program for residential conservation to be funded by these BFR revenues.

Since the proposals requested have not been submitted and are, in fact, the subject of this litigation, it appears that the funds shall reside in the escrow account, accumulating interest, until such time as either the proposals are forthcoming or, following review by the Commonwealth Court, it is determined that the P.U.C. is without power to order such a conservation program.

With this in mind, I see no harm inuring to Respondent which would justify altering the status quo of the funds in escrow pending appellate resolution of the controversy.

Accordingly, I would reverse the Commonwealth Court's grant of the stay pending appeal.