827 A.2d 375

**In re The PETITION TO SET ASIDE THE NOMINATION PETITION OF Kathleen M. FITZPATRICK as a Democratic Candidate for the Office of Councilperson for the Seventh District of the City of Philadelphia.**

**Petition of Candido Silva, Barbara Stuhl, Eileen Miller, Chester Zalenski and Walter Detruex, Jr.**

**No. 59 EM 2003.**

Supreme Court of Pennsylvania.

May 19, 2003.

## *CORRECTED ORDER*

PER CURIAM.

**AND NOW,** this 19th day of May, 2003, the Application for Relief is hereby DENIED.

1. This matter is presently before this Court Friday, May 16, 2003. The primary election is Tuesday, May 20, 2003.

Justice LAMB concurs with concurring statement to follow.

Justice CASTILLE dissents with dissenting statement to follow.

Justice NIGRO dissents.

## CONCURRING STATEMENT

LAMB, Justice.

This Court declined to enter the fray in this election case for reasons well-rooted in case law and its underlying public policy favoring liberal construction of the Election Code.[1] The tortuous procedure of the case is laid out in the Dissenting Statement and there is no need to repeat it here, except to emphasize that the trial court's initial errors of, first, failing to examine all of the challenged signatures and, second, failing to apply a single standard of review to that examination, were the points at which the problems which this case presented could have been avoided.

The case came to this Court **after** the trial court had stayed its own order which would have removed Kathleen Fitzpatrick's name from the ballot for the Democratic primary in the Seventh Councilmanic Ward of Philadelphia. As the dissent notes, the trial court did not write an a opinion. Therefore, this Court could not know whether or not the trial court had correctly applied the standards set forth in *Pennsylvania Public Utility Commission v. Process Gas Consumers Group*, 502 Pa. 545, 467 A.2d 805 (Pa.1983), and reiterated in *Maritrans G.P., Inc. v. Pepper, Hamilton & Scheetz*, 524 Pa. 415, 573 A.2d 1001, 1003 (Pa.1990) (before granting a request for a stay, the court must be satisfied the issuance of the stay will not substantially harm other interested parties in the proceedings and will not adversely affect the public interest).

This Court was asked to assume extraordinary jurisdiction[2] in order to dissolve the stays of the orders to remove Fitz-

1. 25 P.S. § 2600 *et seq.*, Act of June 3, 1937, P.L. 1333, No. 320.

2. This Court's extraordinary jurisdiction is found at:
    42   Pa.C.S. § 726.   Extraordinary jurisdiction

patrick's name from the ballot entered by both the trial court and the Commonwealth Court – albeit on differing issues in the litigation. To do so, this Court could not simply dissolve the stay, but we would have been constrained to find that:

> granting injunctive relief under these circumstances so circumvents our rules that such action transcends a mere error of law and, in fact, exceeds the jurisdiction vested in a court of equity. In cases where we have found an inferior court acting in excess of its authority in adjudicating a case, we have restrained the inferior court through the writ of prohibition as an extraordinary remedy in cases of extreme necessity to secure order and regularity in judicial proceedings if none of the ordinary remedies provided by law is applicable or adequate to afford relief.

*Reading Anthracite Co. v. Rich*, 525 Pa. 118, 577 A.2d 881, 886 (Pa.1990)

In *Glen Mills Schools v. Court of Common Pleas of Philadelphia County*, 513 Pa. 310, 520 A.2d 1379, 1382 (Pa.1987), this Court stated, "a writ of prohibition is proper where the inferior tribunal abuses its jurisdiction." *Glen Mills*, 520 A.2d at 1381. This Court then noted a prior decision, *Capital Cities Media, Inc. v. Toole*, 506 Pa. 12, 483 A.2d 1339 (Pa. 1984), which held that "our cases have extended the application of the writ of prohibition to encompass situations in which an inferior court, which has jurisdiction, exceeds its authority in adjudicating the case. This latter situation has been termed an 'abuse of discretion.'" *Glen Mills*, 520 A.2d at 1381 (quoting *Capital Cities Media*, 483 A.2d at 1342).

The criteria for granting a writ of prohibition are satisfied by meeting a two-pronged test. *Carpentertown Coal and*

> Notwithstanding any other provision of law, the Supreme Court may, on its own motion or upon petition of any party, in any matter pending before any court or district justice of this Commonwealth involving an issue of immediate public importance, assume plenary jurisdiction of such matter at any stage thereof and enter a final order or otherwise cause right and justice to be done.

Extraordinary jurisdiction under Section 726 enables this Court to assume plenary jurisdiction of a matter pending before a court or district justice at any stage. *In re Avellino*, 547 Pa. 385, 690 A.2d 1138, 1141 (Pa.1997).

*Coke Co. v. Laird,* 360 Pa. 94, 61 A.2d 426 (Pa.1948). First, it must be established that there is no adequate remedy at law to afford relief; second, there must be extreme necessity for the relief requested to secure order and regularity in judicial proceedings. Where relief may be sought through ordinary avenues of judicial review, the writ is not appropriate. *Glen Mills,* 520 A.2d at 1382; *see also Commonwealth v. Vartan,* 557 Pa. 390, 733 A.2d 1258, 1263 (Pa.1999).

Therefore, for this court to effect a dissolution of the stays entered by the trial court and the Commonwealth Court, it would have to have found that "there is no adequate remedy at law to afford relief" and "there must be extreme necessity for the relief requested." *Glen Mills,* 520 A.2d at 1382. As a result, for this Court to exercise its extraordinary jurisdiction to lift the stays, it would have to have found that such an action would have been necessary to "secure order and regularity in judicial proceedings." *Glen Mills,* 520 A.2d at 1382.

This Court was not asked to determine whether Fitzpatrick was entitled to her stay but, rather, whether the lower courts act of granting her stay presented an "extreme necessity for relief." *Glen Mills,* 520 A.2d at 1382.

The lower courts had, indeed, found that Fitzpatrick **was** entitled to her stay, which required that she establish that she was likely to prevail on the merits; that she would suffer irreparable injury if she had not been granted a stay; that the issuance of a stay will not substantially harm other interested parties in the proceedings; and, that the issuance of a stay will not adversely affect the public interest. *Reading Anthracite,* 577 A.2d at 884.

The fundamental difference between the concurrence and the dissent in this case concerns the question of whether the stay would substantially harm other interested parties and whether the stay would jeopardize the public interest. Because I believe that removing a name from a ballot substantially harms the interests of the voters by removing their right to choose, I saw no reason to exercise this Court's extraordinary jurisdiction.

The longstanding and overriding policy in this Commonwealth is to protect the elective franchise. *Petition of Cioppa,* 533 Pa. 564, 626 A.2d 146, 148 (Pa.1993)(collecting cases). In so doing, the Election Code should be liberally construed so as not to deprive a candidate of the right to run for office or the voters of their right to elect a candidate of their choice. *Cioppa,* 626 A.2d at 148; *see also In re Nomination of Flaherty,* 564 Pa. 671, 770 A.2d 327, 331 (Pa.2001); *In re Nomination Petition of Wesley,* 536 Pa. 609, 640 A.2d 1247, 1249 (Pa.1994).

Because I saw no extreme necessity for relief under *Glen Mills,* and because leaving Fitzpatrick's name on the ballot best protected the elective franchise, as commanded by *Cioppa,* declining to exercise this Court's extraordinary jurisdiction was the proper course to follow. In this case the voters would suffer substantial harm in that they would not have an opportunity to vote the full range of potential candidates. The public interest would be harmed far more by an intervention in the election and appeal process.

## DISSENTING STATEMENT

CASTILLE, Justice, dissenting.

I write to explain my notation of dissent to the Court's May 19, 2003 order declining to review the propriety of the stays entered by the trial court and the Commonwealth Court below.

This primary election dispute derives from fatal deficiencies in the nomination petition of Kathleen M. Fitzpatrick, a Democratic candidate for the seventh councilmanic district seat in the City of Philadelphia. On May 7, 2003—thirteen days before the primary election—the Honorable John J. O'Grady of the Court of Common Pleas of Philadelphia County found that Fitzpatrick had produced an insufficient number of valid signatures upon her nomination petition. Despite recognizing that this finding on the merits required removal of Fitzpatrick's name from the ballot, Judge O'Grady inexplicably stayed his removal order pending further appeal by Fitz-

patrick. In so doing, Judge O'Grady never discussed the settled standard for issuance of a stay pending appeal. That standard requires the movant to demonstrate: (1) a strong likelihood of success on the merits of her appeal; (2) that the denial of a stay will cause irreparable harm; (3) that the stay will not substantially harm other interested parties; and (4) that the stay will not substantially harm the public interest. *Reading Anthracite Co. v. Rich,* 525 Pa. 118, 577 A.2d 881 (Pa.1990); *Maritrans G.P., Inc. v. Pepper Hamilton & Scheetz,* 524 Pa. 415, 573 A.2d 1001 (Pa.1990), *Pennsylvania PUC v. Process Gas Consumers,* 502 Pa. 545, 467 A.2d 805 (Pa.1983).

The Commonwealth Court further compounded the trial court's error by granting Fitzpatrick's later Application to enforce the stay. In continuing the stay, the Commonwealth Court likewise failed to consider the *Process Gas* standard; nor did it pass upon the merits of Fitzpatrick's appeal. A majority of this Court also declined two separate opportunities to review and correct the patently erroneous stay order: first, when petitioners (the objectors below) requested that this Court exercise extraordinary jurisdiction to review Judge O'Grady's stay order directly; and second, when petitioners sought review of the Commonwealth Court order enforcing the trial court's stay. The result was that the only court to pass upon the actual merits of the election dispute concluded that the candidate did not belong on the primary ballot. Yet that court totally emasculated its order on the merits and the Commonwealth Court and this Court then permitted the stay to stand without conducting either appellate review of the underlying merits or a *Process Gas* review of the propriety of the stay.

As it happened, Fitzpatrick lost the primary, thereby making moot the error in issuing an unwarranted stay. But that hardly excuses the initial error or the failure of the appellate courts to correct it before the election, particularly since Fitzpatrick could just as easily have won the primary. This would have created post-election havoc if Fitzpatrick had then lost her election appeal on the merits, which would have

rendered the primary a sham for voters, presenting an illusory choice between candidates. In that event, the error would not have been harmless; rather, the sham primary would have denied the voters the right to cast a meaningful primary vote by permitting a vote for a candidate who should not have been on the ballot.

I believe that the merits of this election appeal were resolvable in a time-frame that would have accommodated the primary election date and ensured that there would be no illusory primary choice. I also believe that, notwithstanding the truncated time for review of the stay issue created by the trial court's improvident stay order, the Commonwealth Court should have reviewed the stay in light of the governing *Process Gas* standard. Finally, given the essential importance of the right at issue—the right of primary voters to a meaningful vote for a legitimate candidate—I believe that this Court should have intervened in the matter to ensure an appropriate merits resolution before the election.

By necessity, most of the orders entered on this Court's miscellaneous docket are unsupported by opinion, even in those rare instances where truly emergent, meritorious, and important issues are involved. If a matter is truly an emergency, as this one was, it affords little time to prepare a meaningful opinion and, once the emergency is past, it is often a waste of limited resources to explain the ruling. Hence, I would not ordinarily write to explain a dissent to a per curiam order such as this one where the issue has been rendered moot. But in this case there were avoidable errors in the conduct of the litigation itself, errors which served to artificially compress the already-truncated time available for review of an election challenge. In addition to preventing an ultimate merits resolution prior to the election, that avoidable compression of time obliged this Court to entertain a series of emergency filings in a matter that never should have reached the point of "emergency." The contemporaneous litigation of various facets of the dispute in various courts also led to a confusion of circumstances such that the parties and the courts below may have misinterpreted the meaning and effect

of various orders from this Court. And so I write today not only to explain why I believe this Court erred in failing to correct the erroneous stay issued in this election matter, but also in the hope that, by addressing the avoidable procedural errors that ultimately came to control the merits outcome, the lower courts and future litigants may avoid similar pitfalls and thereby avoid a future breakdown in the timely review process.

After Fitzpatrick filed her nomination petition, petitioners petitioned the trial court to set the nomination aside on grounds that it was supported by an insufficient number of valid signatures. (To secure a place on the primary ballot, the candidate needed 750 signatures; Fitzpatrick's nomination petition contained 1,454 signatures.) Petitioners challenged over half of the individual signatures gathered by Fitzpatrick, citing a variety of grounds: *i.e.*, the person was not a registered voter in that party or in that district; the person had signed the primary opponent's nomination petition; or the signature of the voter did not match the signature on record; or a date or address was missing, *etc.* Given the constraints of the Election Code, the time available to forward the nomination challenge, to try the challenge, and to afford orderly appellate review (including both direct review and the possibility of discretionary review by this Court) was limited to a period of ten weeks.[1]

The trial court's initial avoidable error was in its failure to rule upon all of petitioners' objections at the first hearing on the matter on March 25, 2003. Despite objection from both parties to what Fitzpatrick's counsel aptly termed an "incomplete" ruling on the objections, the court inexplicably refused to entertain additional objections to signatures once it deter-

---

1. The Election Code requires that all nomination petitions be filed on or before the tenth Tuesday prior to the primary, 25 P.S. § 2873(d), and that objections to those petitions be filed within seven days of the last day for filing the nomination petition. *Id.* § 2937. The trial court must hold a hearing on the objections within ten days. *Id.* The 2003 primary election was scheduled for May 20, 2003, making March 11, 2003 the tenth previous Tuesday. The objections were timely filed on March 18, 2003, and the trial court's initial hearing was timely held on March 25, 2003.

mined that Fitzpatrick had only 744 valid signatures and, thus, already had to be removed from the ballot. At that point, petitioners had outstanding objections to 105 additional signatures. N.T. 3/25/03, 231–34. The court's decision ineluctably led to unnecessary, piecemeal appellate review which consequently exhausted much of the little review time afforded under the Election Code.

Predictably enough in a hotly-contested primary such as this, this initial error resulted in a worst-case scenario for orderly and timely review. Fitzpatrick appealed, challenging the trial judge's ruling on a limited number of stricken signatures. A three-judge panel of the Commonwealth Court heard the appeal on an expedited basis and decided the case promptly on April 8, 2003. The court found potential merit in Fitzpatrick's claims respecting thirteen signatures from disabled nursing home residents at the Golden Slipper Jewish Home for the Aged, who had employed "ditto marks" to indicate their addresses and occupations (all were retired). The court remanded the matter for further proceedings on those thirteen signatures, since the trial court had refused to hear Fitzpatrick's offer of proof as to the signers' disabilities. *In re Petition to Set Aside Nomination of Fitzpatrick,* 822 A.2d 859 (Pa.Cmwlth.2003).

In that appeal, petitioners had noted the pendency of their 105 additional objections, but the Commonwealth Court made no reference to the challenges in its opinion or mandate. Fearful that they might be precluded from pursuing the additional objections on remand, petitioners sought clarification from the Commonwealth Court, but the court denied relief in a single-judge order filed on April 11, 2003, which suggested that, by not properly cross-appealing the trial court's initial order,[2] petitioners who were the prevailing party at trial had waived the issue.

**2.** Petitioners did not file a cross-appeal until after oral argument in the Commonwealth Court on April 8, 2003, and apparently in response to that oral argument. On April 9, 2003, petitioners filed a praecipe to discontinue the cross-appeal, which had been filed out of time.

Thereafter, on April 16, 2003, the trial court held the remand hearing but limited the proceeding to the 13 nursing home signatures which were the subject of the Commonwealth Court's remand order. The court overruled the objections to twelve of the signatures and thus found that Fitzpatrick now had a sufficient number of signatures (756) to remain on the primary ballot. Petitioners appealed this determination to the Commonwealth Court, which ultimately affirmed in an opinion filed on May 1, 2003, *see In re Fitzpatrick,* 822 A.2d 867 (Pa.Cmwlth.2003), and this Court denied allocatur on May 16, 2003. *See* No. 214 EAL 2003.

In the meantime, litigation concerning the 105 remaining challenges proceeded separately. On April 21, 2003, petitioners filed an Application for Relief in this Court seeking an order directing the trial court to permit them to pursue those challenges in light of the refusal of both the Commonwealth Court and the trial court to let them do so. Fitzpatrick opposed the request arguing, *inter alia,* that although petitioners were not required to cross-appeal the initial favorable order, they could have and, moreover, petitioners did not preserve their objection to the failure to rule upon the 105 additional signatures because the objection "was not vigorously made." This Court obviously agreed with petitioners, as we entered a unanimous per curiam order on April 29, 2003, *remanding to the Court of Common Pleas for "consideration of the merits of the remaining 105 challenges to signatures contained in the Nomination Petition...."* *See* No. 44 EM 2003.

The remand hearing resulting from our order was held on May 7, 2003. After hearing evidence and argument, the trial court sustained fifteen additional challenges, which left Fitzpatrick with only 741 valid signatures. At this point, however, the trial court committed its second time-consuming error: in addition to ordering Fitzpatrick removed from the ballot, it immediately and incongruously stayed that order. The court did not explain the reason for issuing the stay, other than to say that it "suspect[ed] [that] this is a unique type of situation." N.T. May 7, 2003, 231–33. The stay followed upon an

argument by Fitzpatrick that the trial court had discretion to "revisit" some of the signatures it had stricken from the nomination petition during the March 25th hearing. Fitzpatrick argued that the court employed a different standard at the May 7th hearing than at the March 25th hearing to similar types of challenges and, if the court were to revisit the previous rulings under the "new" standard, more signatures would be deemed valid and she would have enough signatures to remain on the ballot. *Id.* at 222–25. The trial court seemed to agree that it had applied a different standard, but noted that that was only because Fitzpatrick's attorney at the March 25th hearing did not make the argument that she now made with new counsel at the May 7th hearing. The court nevertheless correctly realized that it could not reopen the previous challenges but suggested that, if it were ordered to do so by this Court, it would reconsider them. It was this prospect, rather than any application of the *Process Gas* standard, which led to the stay order.

Even aside from the fundamental question of whether the trial court's stay could be justified on *Process Gas* grounds, the stay ruling caused further havoc because it created a litigation incentive for Fitzpatrick—the technically losing party on the merits—not to appeal the merits decision promptly to Commonwealth Court to ensure a pre-election merits review and final decision. In fact, Fitzpatrick did not take an immediate appeal. Instead, on May 9, 2003, she filed an Application in this Court ostensibly seeking "clarification" of our April 29, 2003 remand order. But the Application alleged no lack of clarity in this Court's order. Instead, Fitzpatrick requested that this Court exercise its extraordinary powers, *see* 42 Pa.C.S. § 726, and order the trial court to allow her to relitigate 32 of the sustained challenges made during the March 25th hearing, rulings Fitzpatrick did not challenge in her initial appeal to the Commonwealth Court. Fitzpatrick alleged that the trial judge was "willing[ ] to gladly reconsider" his previous rulings, but only if an appellate court told him he could do so. Petitioners opposed the request, noting correctly that Fitzpatrick had waived these 32 challenges by

not appealing the decision in her direct appeal from the March 25th order. This Court denied Fitzpatrick's request in a unanimous per curiam order filed on May 14, 2003. *See* No. 51 EM 2003.

In the meantime, the inherently contradictory stay ruling created a quandary for petitioners. Since petitioners had technically prevailed, only Fitzpatrick could seek appellate review of the merits. To the extent that petitioners were aggrieved by the stay order, their options were to attempt to seek direct review of the interlocutory order in the Commonwealth Court, the court where any direct appeal would lie, or to seek extraordinary review in this Court.[3]

With the election fast approaching, petitioners chose the latter option. On Tuesday, May 13, 2003, petitioners filed an Application for Extraordinary Relief asking this Court to assume plenary jurisdiction. Petitioners argued that the trial court had erred in granting the stay without even inquiring into the *Process Gas* factors and that, under that test, Fitzpatrick was not entitled to a stay because, *inter alia,* she had no prospect of prevailing upon the merits of any appeal she might eventually take from the May 7th order. Petitioners argued that the rapidly approaching election warranted this Court's extraordinary intervention. Fitzpatrick opposed the Petition.

On Friday, May 16, 2003, before this Court could rule on petitioners' Application, Fitzpatrick filed her own Application under that docket number seeking remand of the stay issue to the Commonwealth Court. Fitzpatrick related she had finally appealed the trial court's May 7th ruling to the Commonwealth Court that same morning, doing so only because she had just learned that the City Commissioners allegedly had ignored Judge O'Grady's stay order and had begun removing her name from the voting machines.[4] Fitzpatrick also averred

3. Petitioners alleged that they sought certification of the stay order, but the trial court denied the request.

4. Testimony from counsel to the City Commissioners revealed that the Commissioners undertook this action based upon their interpretation of the necessary consequences of this Court's order of May 14th declining

that she had requested that the Commonwealth Court issue its own stay pending her appeal. Commonwealth Court scheduled a hearing on Fitzpatrick's appeal and motion before a single judge for 1:00 p.m. that same day.

Two orders were then filed late that Friday afternoon, one by the Commonwealth Court and one by this Court. Taking this Court's order first, a divided Court entered a per curiam order denying the application to assume plenary jurisdiction. I filed a short dissenting statement, which was joined by Justice Nigro and Justice Eakin. I noted that, although I agreed with the Majority that election matters such as this should generally proceed in an orderly manner through the appellate process, and that the Commonwealth Court was the proper tribunal in which petitioners should generally seek relief from a trial judge's obviously erroneous stay order, we could not ignore the reality of the pending election date. Moreover, given the fundamental right involved—"the right to vote and the right to have one's vote counted"—I noted that this was a uniquely appropriate case in which to exercise our inherent powers, grant review of the stay order, and dissolve it. *See In re Petition of Fitzpatrick*, 827 A.2d 374 (Pa.2003) (Castille, J., dissenting), 2003 WL 21147220 (filed May 16, 2003).

As my dissent reflects, I interpreted the Majority's per curiam order on May 16th as merely declining to get involved in order to allow the front-line appeals court to handle both the merits of Fitzpatrick's election appeal and the tangential stay issue in the first instance. Unfortunately, the order as actually entered was self-contradictory and no doubt led to further confusion. Although the per curiam order began by specifically declining to assume jurisdiction, it went on to purport to rule on the merits of the various requests made by petitioners, including the request to dissolve the trial court's

to assume extraordinary jurisdiction so as to allow Fitzpatrick to relitigate the previous challenges. The Commissioners apparently concluded that this Court's ruling removed the basis for Judge O'Grady's stay order, thereby giving effect to his substantive order finding that Fitzpatrick had insufficient valid signatures to remain on the primary ballot.

stay. Of course, we could decide the merits of these requests only if we had first assumed extraordinary jurisdiction.[5] My intention in highlighting the contradiction in the order is not to criticize my colleagues in the Majority, for I confess that I did not notice the contradiction in the rush to decide the motion pending before us that day as quickly as possible, so as to maximize the time remaining before the actual election for the benefit of the parties, local election officials, and the Commonwealth Court. Rather, I highlight the error as another example of the pitfalls attending the avoidable and artificially-compressed time frame in this case.

Further confusion no doubt resulted from the fact that the order issued by the Commonwealth Court that day—an order that in fact preceded in time this Court's order—granted Fitzpatrick's stay application. The Commonwealth Court treated the stay application as a request for a "cease and desist" order against the City Commissioners for violating Judge O'Grady's stay order and removing Fitzpatrick's name from the ballot. So transformed, the Commonwealth Court granted the application and ordered the City Commissioners "to cease and desist from the removal of Fitzpatrick's name from the May 20, 2003, primary ballot until her appeals have been resolved or until further order of this court." Unfortunately, the Commonwealth Court neither passed upon the merits of Fitzpatrick's appeal, nor did it determine whether the trial court properly issued a stay in the first instance under the *Process Gas* standard, despite the fact that petitioners had made both a merits argument and a *Process Gas* argument to the court.

To further complicate matters, a review of the May 16th hearing transcript indicates that part of the Commonwealth Court's reasoning for enforcing the stay may have derived

5. The per curiam order reads as follows:

> **AND NOW**, this 16 th day of May, 2003, the Application to Assume Extraordinary Jurisdiction is DENIED; the Petition to Dissolve the trial Court's Stay of May 7, 2003, is DENIED; the Petition to Adjudicate the Strikes is DENIED; the Petition to Direct the City Commissioners to Remove Respondent's Name from the Ballot is DENIED; and, any other extraordinary relief is DENIED.

from a misapprehension of the meaning and effect of this Court's May 14th order, which had denied Fitzpatrick's request for extraordinary review. The Commonwealth Court, which was acting without the benefit of much time at all, mistakenly viewed that order as having refused to dissolve the stay. See N.T. May 16, 2003, at 68 ("Now, the Order of the Supreme Court dated May 14[th], 2003 was in response to an Application for Extraordinary Relief for dissolution of the stay. The order denied the application."). Neither party corrected the court's misapprehension.

Because the Commonwealth Court's "cease and desist order" was technically entered prior to this Court's order declining to exercise jurisdiction, our order that day may have given the misimpression that we approved of the Commonwealth Court's same-day ruling enforcing the trial court's stay. But such was not the case.

All of this background brings us to the final petition in this matter, which was filed at the opening of business on the very next business day, Monday, May 19, 2003, the day before the primary election. No. 59 EM 2003. The Commonwealth Court now having ruled, petitioners sought direct review of the stay issue, claiming that the Commonwealth Court erroneously continued the stay because Fitzpatrick had not met the standard for granting a stay in the first place. Petitioners cited the *Process Gas* test. Fitzpatrick opposed the petition arguing, among other things, that it merely echoed the extraordinary review request which had been denied on May 16th. This Court ascertained that the Commonwealth Court was preparing an opinion in the matter and awaited the filing of that opinion, since it might address the merits. Unfortunately, that opinion, like the order of the previous Friday, considered neither the merits of Fitzpatrick's election appeal nor, in explaining its enforcement of Judge O'Grady's stay order, did the Commonwealth Court discuss or apply the *Process Gas* standard.

With the election nigh upon us, this Court again divided on the question of whether to review the stay issue, this time in a direct review capacity, with the Majority electing to decline

review. The primary election then proceeded the next day with Fitzpatrick on the ballot, notwithstanding that (1) the only judge to rule on the merits had determined that she was ineligible to be there, and (2) no court had ever found that she was likely to prevail upon the merits of her appeal from the stayed decision to remove her.

I dissented from the Court's decision to remain uninvolved, for reasons that are obvious from this procedural history. The trial court's order was inherently contradictory: it ruled against Fitzpatrick on the merits, thereby requiring her removal from the ballot, but then stayed that order, which had the effect of keeping her on the ballot. The standard for granting a stay of an order pending appeal is well-settled, and yet, neither of the courts below which acted to stay the removal order pending Fitzpatrick's appeal ever suggested that she had met the *Process Gas* standard. Application of that standard should not have been difficult. The apparent basis for Fitzpatrick's appeal is not a claim that Judge O'Grady erred in passing upon the additional 105 objections which were before him at the May 7th hearing, but rather that she should be permitted to relitigate 32 other challenges, which were sustained in the March 25th proceeding, but which she did not challenge in her initial appeal to Commonwealth Court. If Fitzpatrick believed that Judge O'Grady erred at the initial hearing in striking names of these particular voters, however, it was incumbent upon her to raise that challenge in her initial appeal to the Commonwealth Court. Her failure to do so results in waiver and, accordingly, she is distinctly unlikely to prevail upon the merits of her belated appeal from the May 7th ruling. Accordingly, I would have granted petitioners' Application, vacated the improvident stay entered by Judge O'Grady as well as the Commonwealth Court's cease and desist order, and would have enforced Judge O'Grady's substantive order removing Fitzpatrick from the ballot. That is why I dissented on May 16th: it was obvious that the stay entered was erroneous and I believed that action by this Court was necessary in order to ensure that the primary election in this district was meaningful.

The Court's decision not to intervene permitted a patently erroneous stay decision to control the merits outcome in this case and prevented effective appellate review before the election actually took place. The events which unfolded also demonstrated why it is that I continue to believe that this Court erred in declining to exercise extraordinary jurisdiction over the matter on Friday, May 16, 2003—when there was still time to render a substantive decision.

As noted above, I do not write merely to explain my disagreement over an emergency matter handled by per curiam order, or to chastise the Majority over what I view as its mistaken failure to take timely action to correct a patently erroneous decision below. I realize that this Court has neither the time nor the resources to correct all errors below. I also realize that, notwithstanding the letter of the law — *i.e.,* the actual *Process Gas* standard ignored by two courts below—the timing and posture in which the stay issue presented itself to this Court made inaction seem like a less disruptive alternative, particularly since there was the possible nullification of error if the candidate lost.

Rather, I write because this is an election matter which should have been finally decided on the merits before the election, but was not, and because the case should have been so decided without the necessity of burdening this Court's docket with multiple emergency petitions from both sides—as the many other election matters arising this cycle were. That the case was not decided in such an orderly and timely fashion—single hearing below, single direct appeal to the Commonwealth Court, and single allocatur petition here (if necessary)—resulted from entirely avoidable errors in judgment below, which I have already highlighted. I write to stress to the courts below the necessity for deciding such matters in a single, thorough and timely hearing and appeal. And, I write to stress to both courts below the necessity of ascertaining and applying the governing law when faced with a request for a stay, rather than essentially converting the prevailing party into the losing party and thereby creating an incentive for the losing party not to seek review of an adverse

ruling on the merits, in an election matter which involves a bedrock principle of our government, as soon as possible.

Justices Nigro and Eakin join this Dissenting Statement.