22 A.3d 238

**HAMPTON TECHNOLOGIES, INC. d/b/a**
**Gordon Group Electric, Petitioner**

v.

**DEPARTMENT OF GENERAL SERVICES, Respondent**

**Farfield Company, Intervenor.**

Supreme Court of Pennsylvania.

June 24, 2011.

## *ORDER*

PER CURIAM.

**AND NOW,** this 24th day of June, 2011, the Court being equally divided, Petitioner's Emergency Application for Stay is DENIED.

Chief Justice CASTILLE did not participate in the consideration or decision of this case.

Justice BAER files a Dissenting Statement.

Justice McCAFFERY files a Dissenting Statement.

Justice TODD dissents.

Justice BAER, dissenting.

I respectfully dissent from the *per curiam* order in the above-captioned case. Gordon Group Electric (Gordon) seeks

an emergency stay of the Department of General Service's ("DGS") Final Determination denying Gordon's protest to the award of an electrical contract to Intervenor The Farfield Company (Farfield) for the construction of the Philadelphia Family Court Building (Family Court Project).

On January 14, 2011, DGS awarded an electrical contract exceeding $20 million to Farfield, pursuant to DGS's Request for Proposal (RFP) for the Family Court Project, notwithstanding that Gordon was the low offeror. DGS sought competitive sealed proposals for four prime contracts, including the electrical contract at issue in this case, pursuant to 62 Pa.C.S. § 513, providing for competitive sealed proposals. 62 Pa.C.S. § 513(a) ("When the contracting officer determines in writing that the use of competitive sealed bidding is either not practicable or advantageous to the Commonwealth, a contract may be entered into by competitive sealed proposals.").

Following the award, DGS debriefed Gordon representatives as to why Farfield, as opposed to Gordon, was awarded the contract. While DGS explained that Gordon received "weak" scores in certain evaluative categories, DGS refused to provide the detailed "score sheets" used in the determination. As a disappointed offeror, Gordon filed a protest on January 21, 2001, with DGS pursuant to 62 Pa.C.S. § 1711.1(a) ("A bidder or offeror ... that is aggrieved in connection with the solicitation or award of a contract ... may protest to the head of the purchasing agency in writing."). In its protest, Gordon contended that DGS inappropriately considered the electrical contractors' experience with LEED Certification,[1] alleging that the factor was not included in the solicitation criteria of the RFP for the Family Court Project. Accordingly, Gordon claimed that any award based on such criteria would be arbitrary and capricious. Gordon also asserted that DGS inappropriately refused to reveal the specific score sheets in violation of Gordon's due process rights.

1. LEED, which stands for Leadership in Energy and Environmental Design, is an internationally recognized green building certification system.

On January 25, 2011, Gordon filed a supplement to its protest. Significantly, as described in more detail below, the supplement was filed after the expiration of the seven-day statutory period for filing protests.[2] In the supplement to its protest, Gordon claimed that the winning electrical contractor, Farfield, provided false statements when it submitted its proposal. Specifically, Gordon asserted that Farfield, in response to specific questions in the RFP, averred that the firm had not had any business or professional license suspended or revoked, when in fact, its Chief Operating Officer (COO), who was also a Family Court Project team member, had his Master Electrician license suspended by the City of Reading due to his use of improperly licensed electricians over the course of a project in Reading. Gordon argued that the inaccurate submission constituted grounds for rejecting Farfield's proposal or at least for reducing its scores and triggering a revaluation of the relative strengths of the proposals.

After reviewing the protest and a response filed by the contracting officer of DGS, the Deputy Secretary for Administration of DGS issued his determination pursuant to 62 Pa. C.S. § 1711.1.[3] The Deputy Secretary concluded that the

**2.** The Procurement Code allows disappointed offerors to file protests as follows:

> b) Filing of protest.—If the protestant is a bidder or offeror or a prospective contractor, the protest shall be filed with the head of the purchasing agency within seven days after the aggrieved bidder or offeror or prospective contractor knew or should have known of the facts giving rise to the protest except that in no event may a protest be filed later than seven days after the date the contract was awarded. If the protestant is a prospective bidder or offeror, a protest shall be filed with the head of the purchasing agency prior to the bid opening time or the proposal receipt date. If a bidder or offeror, a prospective bidder or offeror or a prospective contractor fails to file a protest or files an untimely protest, the bidder or offeror, the prospective bidder or offeror or the prospective contractor shall be deemed to have waived its right to protest the solicitation or award of the contract in any forum. Untimely filed protests shall be disregarded by the purchasing agency.

62 Pa.C.S. § 1711.1(b).

**3.** For purposes of the agency's review of the protest, 62 Pa.C.S. § 1711.1 provides:

"protest should be denied as clearly without merit." Determination Letter of March 21, 2011.

The Deputy Secretary observed that the RFP provided that scores would be evaluated under a weighted formula: 50% for cost, 45% for technical, and 5% for disadvantaged business submissions. The scoring summary revealed that Farfield received a weighed technical score 11.34 points higher than Gordon (raw score multiplied by 45%), but Gordon received a weighted cost score 2.72 points (raw score multiplied by 50%) and a disadvantaged business score .24 points (raw score multiplied by 5%) higher than Farfield. After applying the weighted formula, the Deputy Secretary observed that Farfield's combined score was higher than Gordon's score, apparently by a weighted score of 8.38 points.

In regard to Gordon's claim that DGS inappropriately considered the electrical contractors' experience with LEED Certification, the Deputy Secretary found, *inter alia*, that Appendix M to the RFP provided a scoring matrix that specifically referenced LEED experience in two categories worth 21 of the potential 400 technical points.

Addressing Gordon's claim that DGS failed to release the score sheets, the Deputy Secretary indicated that DGS has

(e) Evaluation of protest.—The head of the purchasing agency or his designee shall review the protest and any response or reply and may request and review such additional documents or information he deems necessary to render a decision and may, at his sole discretion, conduct a hearing. The head of the purchasing agency or his designee shall provide to the protestant and the contracting officer a reasonable opportunity to review and address any additional documents or information deemed necessary by the head of the purchasing agency or his designee to render a decision.

(f) Determination.—Upon completing an evaluation of the protest in accordance with subsection (e), the head of the purchasing agency or his designee shall issue a written determination stating the reasons for the decision. The determination shall be issued within 60 days of the receipt of the protest unless extended by consent of the head of the purchasing agency or his designee and the protestant. The determination shall be the final order of the purchasing agency. If the head of the purchasing agency or his designee determines that the solicitation or award of the contract was contrary to law, he may enter an order authorized by section 1711.2 (relating to solicitations or awards contrary to law).

62 Pa.C.S. § 1711.1.

posted the scoring summary on its website. The Deputy Secretary additionally concluded that a disappointed offeror does not have any right to the actual scoring sheets under the Right To Know Law, 65 P.S. § 67.708(b)(26) ("[T]he following are exempt from access by a requester under the [Right to Know Act] ... the identity of members, notes and other records of agency proposal evaluation committees established under 62 Pa.C.S. § 513 (relating to competitive sealed proposals).").  Accordingly, the Deputy Secretary concluded that Gordon failed to demonstrate that it had a right to the score sheets.

Turning to the timeliness of the supplement to the protest, the Deputy Secretary concluded that Farfield's technical proposal, which included the allegedly fraudulent information concerning the COO, was posted on the DGS website on January 15, 2011.  He concluded that Gordon then had seven days from that date to file a protest, which would have been Saturday January 22, 2011, thus giving Gordon until Monday, January 24, 2011 to file.  It noted that the protest was therefore untimely because it was filed January 25, 2011, one day late.

Although he found it untimely, the Deputy Secretary addressed the merits of the fraudulent filing claim.  He emphasized that while the City of Reading took action by suspending Farfield's COO it did not take any action against Farfield, the corporation.  He noted that the relevant statements provided in the proposal submitted by Farfield were directed at whether "the Firm" had been suspended.  Ultimately, the Deputy Secretary denied Gordon relief.  Under the relevant statute, the Deputy Secretary's Determination constitutes a final order of the agency.  62 Pa.C.S. § 1711.1(f).

Gordon filed a petition for review in the Commonwealth Court's appellate jurisdiction and an application for stay pending review.[4]  The Commonwealth Court summarily denied

4.  The Procurement Code provides in relevant part as follows regarding appellate review of a determination by the procuring agency:

Gordon's request for a stay, concluding that Gordon failed to meet the standard set forth in *Pennsylvania Public Utility Commission v. Process Gas Consumers Group*, 502 Pa. 545, 467 A.2d 805 (1983).

While the petition for review is pending in Commonwealth Court, Gordon filed with this Court an Emergency Application for Stay of DGS's denial of its protest.

As we have noted, *Process Gas* requires the party seeking the stay to demonstrate the following criteria:

1.   The petitioner makes a strong showing that he is likely to prevail on the merits.

2.   The petitioner has shown that without the requested relief, he will suffer irreparable injury.

3.   The issuance of a stay will not substantially harm other interested parties in the proceedings.

§ 1711.1.   Protests of solicitations or awards

\*     \*     \*

(g) Appeal.—Within 15 days of the mailing date of a final determination denying a protest, a protestant may file an appeal with Commonwealth Court.   Issues not raised by the protestant before the purchasing agency are deemed waived and may not be raised before the court.

\*     \*     \*

(i) Standard of review.—The court shall hear the appeal, without a jury, on the record of determination certified by the purchasing agency.   The court shall affirm the determination of the purchasing agency unless it finds from the record that the determination is arbitrary and capricious, an abuse of discretion or is contrary to law.

(j) Remedy.—If the determination is not affirmed, the court may enter any order authorized by 42 Pa.C.S. § 706 (relating to disposition of appeals), provided that, if the court determines that the solicitation or award of a contract is contrary to law, then the remedy the court shall order is limited to canceling the solicitation or award and declaring void any resulting contract.

(k) Stay of procurement during pendency of protest—In the event a protest is filed timely under this section and until the time has elapsed for the protestant to file an appeal with Commonwealth Court, the purchasing agency shall not proceed further with the solicitation or with the award of the contract unless and until the head of the purchasing agency, after consultation with the head of the using agency, makes a written determination that the protest is clearly without merit or that award of the contract without delay is necessary to protect substantial interests of the Commonwealth.

62 Pa.C.S. § 1711.1

4. The issuance of a stay will not adversely affect the public interest.

*Id.* at 808–09. We additionally noted, however, that a court, "when confronted with a case in which the other three factors strongly favor interim relief[,] may exercise its discretion to grant a stay if the movant has made a substantial case on the merits." *Id.* at 809. We further observed, "The requirement that the applicant for a stay show that it is likely he will prevail on the merits should not be an inflexible rule. This criterion must be considered and weighed relative to the other three criteria." *Id.* n. 8.

Before this Court, Gordon claims that an immediate stay of the denial of its protest of the award is necessary:

Immediate relief in the form of a stay is critical because absent a stay, DGS intends immediately to proceed with the award of the electrical contract to Farfield, and Farfield intends to commence work on the project, in circumstances where: (i) DGS improperly applied criteria that was not set forth in the mandatory or nonmandatory requirements of its Request for Proposals to the detriment of Gordon; (ii) DGS violated Gordon's due process rights by refusing, on Right to Know Law grounds, to disclose substantive information about the scoring of Gordon's and Farfield's proposals; (iii) DGS improperly concluded that Gordon's bid protest supplement identifying false representations set forth in Farfield's proposal, which was submitted to DGS less than twenty-four hours after Gordon obtained documentation demonstrating that the representations were false, was untimely; and (iv) DGS improperly concluded that Farfield's false representations regarding the licensure of its head project manager on the project were not false or material to its proposal, in contravention of DGS's Request for Proposal.

Emergency Application for Stay at 2.

Although Gordon cannot definitively show that it will prevail on the merits, I conclude that a stay is warranted after considering the three other *Process Gas* criteria, especially

when remembering that Gordon was the low offeror and considering the challenge raised by Gordon in its supplemental protest regarding the suspended license of Farfield's COO. First, I must address the alleged untimeliness of the supplemental protest. I refuse to disregard the supplemental protest because it was filed one day late, especially when the original protest was timely and the timeliness criteria of the statute does not reference the timeliness of supplements. 62 Pa.C.S. § 1711.1(b) ("If the protestant is a bidder or offeror or a prospective contractor, the protest shall be filed with the head of the purchasing agency within seven days after the aggrieved bidder or offeror or prospective contractor knew or should have known of the facts giving rise to the protest except that in no event may a protest be filed later than seven days after the date the contract was awarded.")

On the merits, I am troubled that DGS failed to reevaluate the scoring of the electrical contractors following the revelation that Farfield's COO's Master Electrician license had been suspended in the City of Reading. I note that the RFP specifically requires that "The Proposer is not currently under suspension or debarment by ... any other local ... government." RFP § 1.22(h). Furthermore, the RFP provides that "[a]ny misrepresentation of a material fact or omission of a material fact by the entity submitting the proposal shall be treated as fraudulent concealment" and a misrepresentation is grounds for defaulting. RFP § 1.22(a). I view the distinction between the COO and Farfield as a slender reed for DGS to perch upon when declaring Gordon's protest as "wholly without merit." At the very least, the revocation of the COO's Master Electrician license raises red flags that should have altered the technical score in Gordon's favor. Accordingly, I conclude that Gordon makes a substantial showing of a likelihood of success on the merits by asserting that DGS's denial of Gordon's protest, which raised the issue of the suspended license, was "arbitrary and capricious, an abuse of discretion or ... contrary to law." 62 Pa.C.S. § 1711.1(i).

Given a showing of potential success on the merits, Gordon presents a strong case that it will suffer irreparable harm if a

stay is denied in this case. Gordon contends that absent a stay pending action on the Petition for Review in Commonwealth Court, DGS and Farfield will go forward with the contract and begin the electrical work. Indeed, the parties acknowledge that the electrical work constitutes some of the earliest work on the Project. Gordon argues that once work begins on the electrical portion "no measure of appellate relief will be able to undo these events." Emergency Application for Stay at 13. In the time it may take for an appeal to process through the courts, absent the exigency of a stay, the building could be well-underway and certainly many subcontracts and employment contracts will be established that will be very difficult to undo in the event Gordon is successful in Commonwealth Court, considering the magnitude and complexity of the Project.

Gordon also emphasizes that not only are Gordon's interests subject to irreparable harm, but the public is also subject to the harm of a substantial public contract being awarded to a party that is not entitled to the award.

In contrast, little harm will result from delaying further progress on this contract until the Commonwealth Court, potentially acting with exigency, resolves the merits of the case. DGS and Farfield fail to convince me that harm will result to the parties from the minor delay needed to attain review of the merits before the Commonwealth Court. While all know that Philadelphia needs a new Family Court building, it has shown itself capable of operating under the current conditions for decades, and the truth is it will not be harmed if this building is completed several weeks later to permit this $20 million dispute to be resolved in an orderly fashion. As accurately noted by Gordon, "delay pending this appeal would not cause substantial harm to the Commonwealth, particularly in view of the irreparable injury that would be suffered by Gordon and the public interest in the absence of a stay pending appeal." Emergency Application for Stay at 13.

Accordingly, I favor granting the stay to allow a full determination on the merits of the petition for review currently before Commonwealth Court, given the substantial public

interest in the construction proceeding without any appearance of impropriety.

Justice McCAFFERY, dissenting.

I fully join Justice Baer's Dissenting Statement. I write separately to emphasize my concern that this Court assure the citizens of the Commonwealth, and particularly those of Philadelphia, that the construction of the new Family Court building in Philadelphia is being pursued with the utmost attention to the overall fairness of the entire process, specifically including that by which the contractors are selected. It is not in the public interest to allow this project to proceed where any aspect of the construction process may colorably be questioned. Because the paramount interest at issue here is the integrity of the process by which each aspect of the construction of the Family Court building goes forward, I believe it is appropriate to maintain the *status quo* until resolution of the instant appeal by the Commonwealth Court. This is especially true in light of the fact that maintaining the *status quo* will not add significantly to the timeliness with which the overall project may proceed, while the potential harm to the public interest and to the Petitioner/Applicant will be irreparable if the stay is not granted, as that effectively ends the entire matter. Therefore, I would grant a stay until resolution of the appeal pending before Commonwealth Court.