17 A.3d 375

**In re Nomination Petition of Lawrence FARNESE, Jr., for the Democratic Nomination for Senator in the General Assembly for the First Senatorial District in the Primary Election to be Held on April 22, 2008.**

**Appeal of Keith Olkowski and Theresa A. Paylor.**

Supreme Court of Pennsylvania.

March 29, 2011.

Castille, C.J., concurred and filed opinion.

Saylor, J., concurred and filed opinion.

Eakin, J., concurred and filed opinion, in which Baer, J., joined.

574

Samuel C. Stretton, Law Office of Samuel C. Stretton, West Chester, for appellant.

David J. Montgomery, Clifford B. Levine, Thorp Reed & Armstrong, L.L.P., Pittsburgh, for appellee.

CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, GREENSPAN, JJ.

## *OPINION IN SUPPORT OF PER CURIAM ORDER*

Justice McCAFFERY.

In 2008, Appellee, Lawrence Farnese, Jr., then a candidate for state senator, filed a nomination petition to be on the Democratic Party's primary election ballot. Pursuant to 25 P.S. § 2872.1(13), a nomination petition for that office must contain at least 500 signatures, and Appellee's petition contained 1778 signatures. When the validity of the signatures was challenged on a number of grounds in the Commonwealth Court, Appellee withdrew 934 signatures on the advice of counsel, who agreed that the withdrawn signatures were invalid because they had not been procured in the actual presence of the circulators of the signature pages. During the

course of litigation, Appellee stipulated that an additional 143 signatures were invalid. Ultimately, the Commonwealth Court denied the petition of objectors, Appellants Keith Olkowski and Theresa A. Paylor, to set aside Appellee's nomination petition, and they appealed to this Court.

On April 8, 2008, we entered a *per curiam* order on an expedited basis permitting Appellee to remain on the primary election ballot. *In re Nomination Petition of Farnese*, 605 Pa. 375, 989 A.2d 1274 (2008) (*Farnese I*). We entered the order despite our concerns that Appellee had submitted and then withdrawn or stipulated to the invalidity of the majority of the signatures contained in his nomination petition.[1] In our *per curiam* order, we stated that an opinion would follow, and this opinion now addresses Appellants' issues on appeal, and expresses our concern that a candidate for office should not be permitted to submit a nomination petition that contains mostly illegitimate signatures without doubt being cast upon the propriety of the candidate's entire signature procurement process.

As a matter of election law procedure, each circulator of a signature page contained in a candidate's nomination petition must attach a separate affidavit declaring, among other things, that the signers thereto actually personally signed the petition with full knowledge of the contents of the petition.[2] This Court has held that in order to verify this

1. Our order affirmed the Commonwealth Court's denial of Appellants' petition to set aside Appellee's nomination petition, without prejudice to Appellants' right to seek review of any future final order imposing costs. We remanded with directions for the Commonwealth Court to explain its rationale if it chose to impose costs. On remand, the court imposed costs and Appellants filed an appeal from the imposition of costs at No. 13 EAP 2008. We reversed on the basis that the facts did not support a finding that an award of costs was just. *In re Nomination Petition of Farnese*, 17 A.3d. 357 (Pa.2010) (*Farnese III*).

2. Section 909 of the Election Code requires that each signature sheet shall have appended thereto the affidavit of the circulator of each sheet, and this Court has recognized that the language in Section 909, 25 P.S. § 2869, unambiguously requires that the circulator affirming the petition be aware of five criteria about each individual signer: (1) the signer signed the petition with full knowledge of its contents; (2) the signer's address is correct; (3) the signer resides in the county in the

information, the circulator needs to be present when each signer agrees to sign the petition. *In re Nomination Petition of Flaherty,* 564 Pa. 671, 770 A.2d 327, 336 (2001).

In this matter, Appellants sought to establish pervasive fraud in the circulators' procurement of signatures on the nomination petition for Appellee. At the hearing on their petition to set aside the nomination petition, Appellants sought to admit into evidence a report prepared by a private detective that contained affidavits from persons whose signatures had been procured or purportedly procured by the persons circulating the signature pages. Some of the signers affirmed that the circulator of the petition had indicated to them that the petition was to upgrade a neighborhood playground. Other signers affirmed that the circulator had indicated to them that the candidate was an African American, and that the circulator had shown them a photo of an African American male who was supposedly that person. Other purported signers affirmed that the signature contained on the signature page was not their signature. Other signers affirmed that the circulator had told them it was permissible to sign the names of others in their household who were not home at the time, and that the signers did, in fact, sign for those absent household members based on that representation. The court ruled that the report of the detective was inadmissible because "allegations of a pattern of fraud are immaterial in a case involving objections to nomination papers and that such allegations will be disregarded." *In re Nomination of Farnese,* 945 A.2d 274, 278 n. 10 (Pa.Cmwlth.2008) (*Farnese II* ).[3]

affidavit; (4) the signer signed the petition on the date set forth; and (5) to the best of the circulator's knowledge and belief, the signer was a qualified elector and a member of the party claimed on the petition. *In re Nomination Petition of Flaherty,* 564 Pa. 671, 770 A.2d 327, 336 (2001).

3. Although the report was not admitted as substantive evidence, it is of record. The court admitted the report "to make the record ... because we have not had testimony in certain areas, [so] that the Supreme Court knows that [Appellants have] not waived those issues and that they're preserved for that purpose and that purpose alone." Notes of Testimony ("N.T."), Hearing, 3/7/08, at 67–68.

Additionally, Appellee filed a motion *in limine* to preclude Appellants from presenting any evidence relating to the twenty-two signature pages that Appellee had withdrawn. Conversely, Appellants sought to present evidence of the withdrawn pages in support of their claims of fraud, because the circulators of many of the withdrawn pages were also the circulators of the non-withdrawn pages to which individual signature challenges were being raised. Indeed, Appellants raised a "global" challenge and asked the court to dismiss all remaining pages of signatures procured by any circulator of a withdrawn page. In support of this request, Appellants sought to call the circulators as witnesses to probe their awareness of, and adherence to, the elements of Section 909 of the Election Code as affirmed in their circulator affidavits attached to the pages of signatures. The court disallowed this proposed area of inquiry, and ultimately ruled that any evidence relating to the withdrawn pages would have been irrelevant to whether the circulator affidavits or signatures on the non-withdrawn pages were valid. *Farnese II, supra* at 278.

In the end, Appellants conceded they could not prevail if the court rejected their "global" challenge, *i.e.*, Appellants conceded that if the court would not invalidate the remaining non-withdrawn signature pages that had been procured by the same circulators who had procured the withdrawn pages, Appellee would then have had 539 presumptively valid individual signatures. To state it another way, Appellants conceded that even if they won each of their remaining challenges **unrelated** to the propriety of the circulator affidavits attached to the signature pages, Appellee would still have had a sufficient number of presumptively valid signatures to remain on the ballot.[4]

4. Appellants maintained that 324 of the 701 signatures remaining after Appellee's stipulations and withdrawals ($1778 - 934 - 143 = 701$) were invalid, and that 162 of those 324 signatures were invalid for reasons other than that the circulator of the signature page had also circulated a signature page that had been withdrawn. Thus, given the court's ruling, even if Appellants had prevailed on each of those unrelated challenges, Appellee still would have had a requisite number of signatures ($701 - 162 = 539$). We note that the Commonwealth Court calculated the total number of remaining presumptively valid signatures

In this appeal, Appellants raise the following questions that we have paraphrased for the sake of brevity and clarity, and will address together:

1. Did the Commonwealth Court err in ruling that evidence of an alleged pattern of fraud was irrelevant to the proceedings to set aside the nomination petition?

2. Did the Commonwealth Court err in ruling that evidence regarding the circulators' procurement of the withdrawn signatures could not be used to invalidate the non-withdrawn signatures procured by them?

First, and foremost, we must disagree with the Commonwealth Court's assessment here that allegations of a pattern of fraud are immaterial in a case involving objections to a nomination petition. Significantly, in *In re Nomination Petition of Nader*, 865 A.2d 8 (Pa.Cmwlth.2004), on remand from this Court, a number of judges of the Commonwealth Court, sitting as fact-finders, conducted an extraordinary review of more than 50,000 signatures contained in the nomination petition of a candidate for President of the United States who sought to appear on the Pennsylvania ballot. The Commonwealth Court judges not only considered allegations of fraud, but actually found widespread fraud, and set aside the petition upon determining that it contained an insufficient number of legitimate signatures. *Id.* at 19. In that case, testimonial evidence was presented that showed how the circulators of the signature pages fraudulently procured, falsified, forged, and failed to authenticate signatures. *Id.* at 16. Among many other things, the court specifically found "that the campaign had knowledge that false signatures were submitted on the nomination papers." *Id.* at 14. Given the gross irregularities in the procurement of signatures, the court felt "compelled" to offer the following observation:

... this signature gathering process was the most deceitful and fraudulent exercise ever perpetrated upon this Court.

using a different formula and arrived at the number of 532. The difference is immaterial, as both resulting totals are greater than the amount necessary to support the petition, and Appellants conceded they could not prevail under the circumstances.

The conduct of the Candidates, through their representatives (not their attorneys), shocks the conscience of the Court. In reviewing signatures, it became apparent that in addition to signing names such as "Mickey Mouse," "Fred Flintstone," "John Kerry," and the ubiquitous "Ralph Nader," there were thousands of names that were created at random and then randomly assigned either existent or nonexistent addresses by the circulators.

*Id.* at 19 (*aff'd, In re Nomination Paper of Nader,* 580 Pa. 134, 860 A.2d 1 (2004), *cert. denied, Nader v. Serody,* 543 U.S. 1052, 125 S.Ct. 884, 160 L.Ed.2d 773 (2005)).

 Where, as here, a candidate for office has agreed that 60.5 % of the signatures contained in his nomination petition are invalid, and the objectors to the petition have asserted fraud in the signature procurement process and are prepared to support those allegations with evidence, we cannot say, in light of *Nader, supra,* that the evidence would be immaterial to the disposition of the petition. Significantly, there is precedent from this Court to support the proposition that evidence regarding the procurement process is a legitimate factual inquiry, and that the existence of a large number of signature irregularities on a signature page may raise a reasonable inference that the circulator's affidavit attesting to the legitimacy of the signatures is false. *Citizen's Com. to Recall Rizzo v. Bd. of Elections, et al.,* 470 Pa. 1, 367 A.2d 232, 241 (1976).[5] The form of nominating petitions and their accompanying affidavits are not mere technicalities, but are necessary measures to prevent fraud and to preserve the integrity of the election process. *In re Nomination Petition of Cianfrani,* 467 Pa. 491, 359 A.2d 383, 384 (1976). The policy of liberally reading the Election Code cannot be distorted to emasculate the requirements of providing legitimate sworn affidavits. *Id.* Any falsity in an affidavit casts doubt on the accuracy of the entire affidavit, and, thus, the authen-

---

**5.** Although the main holding in the case, that the recall provisions in the Philadelphia Home Rule Charter are unconstitutional, represented a plurality of the Court, the proposition cited here commanded a majority view.

ticity of the petition. *Citizen's Com. to Recall Rizzo, supra* at 241.

While prudent candidates for office routinely procure more signatures on their nomination petitions than the number of signatures required by the Election Code, a candidate's agreement that 60.5 % of the signatures that he or she procured are invalid should raise red flags for any court evaluating the process by which any and all of the signatures were procured. Our observation of this troubling circumstance in the instant matter leads to the truly dispositive question here: whether the Commonwealth Court properly denied Appellants' request to invalidate the signatures that Appellee had **not** withdrawn on the basis that the signature petitions on which they appeared had been circulated by the same persons who circulated the petitions that Appellee had withdrawn.

On April 18, 2008, ten days after we entered the *per curiam* order in this case, we also entered a plurality *per curiam* order in a case that presented similar facts. In *In re Payton,* 596 Pa. 469, 945 A.2d 162 (2008), this Court, sitting with six members, entered a *per curiam* order stating that a court cannot presumptively invalidate nomination signatures based on nothing more than the invalidity of other signatures obtained by the same circulator. Justice Saylor filed a Concurring Statement, joined by Justice Todd and this writer, that began as follows: "The majority appears to interpret Section 976 of the Election Code, 25 P.S. § 2936, as establishing a broad-based principle foreclosing judicial inquiries into allegations of pervasive fraud in the submission of a nomination petition beyond a signature-by-signature review." Justice Saylor, Justice Todd and this writer disagreed with that interpretation, and observed that this Court has accepted the notion that the inclusion of intentionally false information in a candidate's affidavit is grounds for invalidating a nomination petition. *Id.* (Saylor, J. concurring) (*citing In re Driscoll,* 577 Pa. 501, 847 A.2d 44, 51 (2004)). Justice Saylor further observed that in his opinion, "the collection by the candidate himself of a substantial number of fraudulent signatures, as has been alleged here, including those of deceased individuals,

would be strong circumstantial evidence of willful non-compliance with election law and false certification." *Id.* Justice Todd and I agreed with Justice Saylor.

Justice Saylor, with whom Justice Todd and this writer agreed, went on to state his disagreement with the utilization of "a brief *per curiam* Order to signal this Court's intention to undermine the viability of election challenges entailing allegations of pervasive fraud claimed to have been known to the candidate." *Id.* Justices Saylor and Todd and this writer ultimately joined the disposition, but only in light of the fact that a specific challenge to the candidate's affidavit and allegations of knowledge of fraud on his part, were not initially raised in the objectors' petition to set aside, and in view of the Commonwealth Court's credibility determination concerning the candidate's testimony. *Id.*

Here, although Appellants' brief to this Court includes numerous allegations that the tactics of the circulators to procure the allegedly illegitimate signatures were known to the candidate and the campaign manager, Appellants did not make this specific objection in their petition to set aside the nomination petition. Although the candidate himself was the circulator of six separate signature pages, none of those pages was withdrawn, and none of the signatures on those pages was stipulated to as invalid. Additionally, the rationale proposed by Appellants for the striking of signatures contained on the non-withdrawn pages procured by the circulators of the withdrawn pages conceded that a number of valid signatures would be stricken for the sake of punishing the fraud committed by the circulators.[6] The Commonwealth Court found this proposed remedy troubling, and opined, "Here, if we would have adopted Objectors' position, we would have stricken admittedly valid signatures on one page based on a defective

6. Counsel for Appellants argued at the hearing "I just want to note that part of our argument [is] the broad public policy ... that this kind of conduct has got to stop, and the only way I know how to stop it is a court ruling **penalizing circulators** who provide bad affidavits from then being rewarded with other petitions where arguably they are good." N.T., *supra* at 33 (emphasis added).

Circulator Affidavit on another page." *Farnese II, supra* at 278 (emphasis omitted).

Significantly, the case law of this Commonwealth that can be read to support the proposition that a false affidavit contained in a nomination petition may be egregious enough to void the petition altogether and remove the candidate from the ballot, applies to intentional and knowing falsehoods affirmed by the candidate personally that are designed to deceive the electorate. *See In re Nomination of Driscoll,* 577 Pa. 501, 847 A.2d 44, 51 (2004) (stating "before an affidavit may be declared void and invalid because it contains false information, there must be evidence that the **candidate** knowingly falsified the affidavit with an intent to deceive the electorate.") (emphasis added). Accordingly, we now hold that allegations and evidence of fraud may be material to the determination of the validity of a nomination petition. Nevertheless, we reject Appellants' second issue on appeal, as there was no specific allegation made, or evidence proffered, that the candidate himself affirmed in his petition any intentional and knowing falsehoods designed to deceive the electorate. The denial of Appellants' petition to set aside the nomination petition of Appellee is affirmed.[7]

7. The Chief Justice states in his concurring opinion that we stray significantly from the parties' arguments, and suggests that the objectors here presented a "single narrow theory." (Castille, C.J., concurring, Op. at 592–93, 17 A.3d at 387). The "narrow" question posed, as we see it, is whether the non-withdrawn pages could be invalidated on a broader "false-in-one-false-in-all" theory. Appellants had hoped to support their "false-in-one-false-in-all" theory by presenting evidence of a pervasive pattern of fraud on the part of the circulators. On the basis that any and all allegations of fraud are irrelevant in determining the propriety of nomination petitions, the trial court did not permit this evidence, or any evidence regarding the circulators' conduct or knowledge of the Election Code, and one of the central allegations on appeal is that the court erred in this ruling. In our discussion of the issues, we do not make any presumption of fraudulent conduct with respect to the withdrawn signatures. Instead, among other things, we point out that at the time the trial court made its ruling, Pennsylvania law clearly supported the proposition that a candidate's fraudulent conduct may nullify a nomination petition, a proposition reiterated by the concurring Opinion in *In Re Payton,* which was decided by an evenly divided Court ten days after our *per curiam* order in the present matter. There were serious allegations in this matter concerning the alleged improper

Justice GREENSPAN did not participate in the decision of this case.

Justice TODD joins the Opinion in Support of *Per Curiam* Order.

Chief Justice CASTILLE files a concurring opinion.

Justice SAYLOR files a concurring opinion.

Justice EAKIN files a concurring opinion in which Justice BAER joins.

Chief Justice CASTILLE, concurring.

This case was decided on April 8, 2008, by *per curiam* order, with a notation that an opinion would follow. I write separately primarily to explain my own reasons for supporting our prior order because they differ from the expression and focus of the Opinion in Support of *Per Curiam* Order ("OIS"); and I write because I respectfully disagree with several aspects of Mr. Justice McCaffery's expression.

## I.

We issue "opinion to follow" mandates very rarely, generally in matters where an immediate decision is required, where there is insufficient time to fashion a precedential expression, and where the issue is important enough, or difficult enough, that the Court realizes that an explanation of the original mandate is a wise course. Election appeals, and other emergency filings where swift action is required, are the most common situations where this practice is employed. I have previously addressed some of the difficulties that are unique to the expedited decisions that issue in election appeals, and have encouraged efficiencies in the courts below to ensure a better prospect for reasoned, timely decisions. *See In re Fitzpatrick,*

conduct of the circulators in procuring signatures for the candidate's nomination petition. The point we make is that had the allegations been more squarely tied to facts tending to show the candidate's awareness and acceptance of these irregularities, the evidence would have been relevant to the important question of whether the electorate had been deceived and whether the candidate should be on the ballot.

573 Pa. 514, 827 A.2d 375, 377–84 (2003) (Castille, J., dissenting, joined by Nigro and Eakin, JJ.). *Accord In re Stevenson,* 12 A.3d 273 (Pa.2010) (*per curiam* ).

There are inherent complications in the "opinion to follow" scenario. First, Justices may agree on the decisional mandate but for different reasons, making it more difficult to fashion a later majority expression in support of the already-rendered order.[1] *See, e.g., In re Paulmier,* 594 Pa. 433, 937 A.2d 364, 377 (2007) (Saylor, J., concurring) (noting that Justice Saylor's joinder in *per curiam* order in *Paulmier* case, which preceded explanatory opinion, was premised on different grounds than outlined in majority opinion and was consistent with reasoned expression in concurrence). Second, further research, intervening cases, and the give and take inherent in the fashioning of a precedential expression may reveal or uncover complications not fully perceived at the time the *per curiam* mandate issued. Indeed, it is fair to say that the *Paulmier* opinion reflects an instance where the Court's deliberation following the *per curiam* mandate led us in a direction that was not fully perceived when the mandate issued. And finally, in election cases where the ruling below allows the candidate to remain on the ballot and the issue is novel or difficult, there is a natural imperative favoring the least disruptive mandate, which is affirmance in direct appeals or inaction in discretionary appeals. *See Fitzpatrick,* 827 A.2d at 384 (Castille, J., dissenting, joined by Nigro and Eakin, JJ.). *See also id.* at 375–77 (Lamb, J., concurring).

With these realities borne of experience in mind, I respectfully cannot join Justice McCaffery's present explanation of our April 2008 mandate. As noted, I write first to explain the distinct reasons why I supported and continue to support

---

1. This case, which involved election for a state office, is before the Court on direct appeal from a single-judge order of the Commonwealth Court. 42 Pa.C.S. § 723(a) (Supreme Court has exclusive jurisdiction over appeals from final orders entered by Commonwealth Court in matters commenced in original jurisdiction of that court); 42 Pa.C.S. § 764 (Commonwealth Court has exclusive original jurisdiction of all election matters related to "[s]tatewide office"); *In re Vidmer,* 65 Pa.Cmwlth. 562, 442 A.2d 1203, 1204 (1982), *aff'd,* 497 Pa. 642, 444 A.2d 100 (1982) (statewide office includes state senators).

affirmance of the Commonwealth Court's decision in this case, and second, to address briefly specific concerns regarding the OIS reasoning.

## II.

On February 11, 2008, objectors Keith Olkowski and Theresa A. Paylor filed an action in the original jurisdiction of the Commonwealth Court to set aside candidate Lawrence M. Farnese, Jr.'s nomination petition pursuant to Section 977 of the Election Code, 25 P.S. § 2937. The objectors claimed "at most 278" of the 1,778 signatures submitted by the candidate were valid and, as a result, the candidate failed to meet the statutory requirement of 500 valid signatures for appearing on the ballot. 25 P.S. § 2872.1(13). According to the objectors, (1) individual signatures had to be stricken because they were invalid on various grounds; (2) pages of signatures had to be stricken because they contained false or invalid circulator affidavits and notarization; and (3) other pages of signatures not suffering from the first two defects had to be stricken because they were gathered by circulators who had submitted invalid affidavits on other pages, or were notarized by a notary who had falsely notarized other pages. The third argument was premised on the trial court accepting a novel "pattern of fraud" or "false-in-one, false-in-all" theory. Finally, in the alternative, the objectors suggested that the entire nomination petition had to be stricken on the ground of "pervasive fraud." [2]

After receiving the objectors' petition, the Commonwealth Court, per the Honorable Rochelle S. Friedman, issued an expedited case management order and set a deadline extended to March 5, 2008, for submitting stipulations, expert reports, and witness lists. On March 5 and 6, 2008, the parties informed the court that the candidate had withdrawn twenty-

---

2. Although the objectors repeatedly suggested striking the entire nomination petition in the interest of maintaining "the probity and integrity" of the electoral process, they failed to develop any relevant issues of law on this point. Instead, the objectors focused primarily on the pattern of fraud claim with respect to the candidate's circulators and notary.

two signature pages (for a total of 934 signatures) and that the objectors had abandoned two full-page challenges. Via the same filings, the parties stipulated to the validity or invalidity of additional signatures. At the same time, the objectors purported to "reserve the right to use" the withdrawn pages as evidence to challenge other individual pages and the entire nomination petition.

To explain the purported reservation of right, the objectors essentially made a "pattern of fraud" or "false-in-one, false-in-all" argument and asked the court to strike as invalid every signature page submitted by any circulator who had a page voluntarily withdrawn by the candidate. Similarly, the objectors argued that all the signature pages notarized by Jonathan J. Oriole had to be stricken because Mr. Oriole had falsely notarized a withdrawn page (page 33). Finally, the objectors expressed their intention to call circulators of withdrawn pages as witnesses at the March 7, 2008, hearing. According to the objectors, the circulators would be examined to reveal whether they "lied under oath" and also regarding "their understanding of the basic criteria of their oath and obligations as a circulator as defined by [Section] 909 of the Election Code[, 25 P.S. § 2869]." The objectors argued that if the circulator did not understand or follow the legal criteria, s/he lied under oath and all of that circulator's affidavits (and signature pages) had to be stricken as invalid. In response, the candidate filed motions *in limine* to preclude the objectors from introducing any withdrawn signature pages into evidence, and from calling individual circulators as witnesses to impeach their credibility regarding the circulator affidavit oaths on non-withdrawn signature pages.

During the hearing, the objectors conceded that the success of their challenge to the candidate's nomination petition depended solely on a favorable ruling by Judge Friedman regarding the candidate's motions *in limine* and, implicitly, her acceptance of the objectors' "pattern of fraud" or "false-in-one, false-in-all" theory. The objectors relied on their pattern of fraud challenge to strike the candidate's name from the ballot, as they otherwise lacked sufficient individual signature objec-

tions. Judge Friedman entertained argument on the objectors' theory and then granted the candidate's motions *in limine*, thus precluding evidence or questioning relating to the withdrawn pages, whether offered as direct proof or for impeachment purposes. According to the court's later opinion, the objectors' evidence relating to the withdrawn pages was "irrelevant to whether the [c]irculator [a]ffidavits or signatures on the non-withdrawn pages were valid" and was, for that reason, inadmissible to prove that the candidate lacked sufficient valid signatures. *In re Nomination Petition of Farnese,* 945 A.2d 274, 277–79 (Pa.Cmwlth.2008).

The court's explanation of its ruling was solidly grounded in existing law. The court explained that it rejected the objectors' evidence proffer because the underlying theory on which it was based—the "pattern of fraud" or "false-in-one, false-in-all" argument—had no support in the Election Code or caselaw. Indeed, the court noted that the Election Code required each signature page to be considered individually, while caselaw suggested that a circulator affidavit could at the same time be false with respect to one or even a significant percentage (*e.g.*, 20%) of signatures but true with respect to the remaining signatures on the same page. Thus, the court reasoned, "admittedly valid signatures on one page" could not be stricken "based on a defective [c]irculator [a]ffidavit on another page." *Id.* (citing 25 P.S. §§ 2936, 2869, *In re Pittsburgh Home Rule Charter,* 694 A.2d 1128 (Pa.Cmwlth.1997), and *In re Nomination Petition of Flaherty,* 564 Pa. 671, 770 A.2d 327 (2001)). In a brief footnote, the court also offered that "[t]o the extent [o]bjectors argue that the circulators of the withdrawn pages appear to have engaged in fraud,". the law is well-established that "allegations of a pattern of fraud" are immaterial in the consideration of whether to strike the candidate's nomination papers. *Farnese,* 945 A.2d at 278 n. 10 (citing *In re Nomination Paper of Rogers,* 908 A.2d 942, 947 (Pa.Cmwlth.2006), in which the court concluded that "[m]ere allegations of patterns of fraud are insufficient to strike a nomination paper" and "[t]o the extent that the [o]bjectors

allege patterns of fraud in the collection of signatures, these allegations are immaterial").

Further, the court explained that it rejected the objectors' request to use the withdrawn pages for impeaching the credibility of potential witnesses, *i.e.*, circulators of both withdrawn and non-withdrawn pages, because, *inter alia*, "it would have been improper for [o]bjectors to use a witness's alleged bad act with respect to a withdrawn page to prove that the witness acted in the same manner with respect to a non-withdrawn page." *Id.* at 278 (citing, *inter alia*, Pa.R.E. 404(b)(1) (evidence of bad acts is not admissible to prove character of person in order to show action in conformity with those bad acts)). Ultimately, the court denied the petition to set aside the candidate's nomination petition on the basis of the objectors' concession that they could not prevail without a favorable ruling by the court on the "false-in-one, false-in-all" theory and the admissibility of evidence regarding the withdrawn pages in support of that theory. *Id.* at 278–79.

On appeal to this Court, the objectors posed two questions: [3]

1. Did Judge Friedman err in not dismissing all Nominating Petition [sic] of circulators and striking the Nomination Petition of Mr. Farnese from the primary election ballot when the circulators had submitted many Nominating Petitions with false and fraudulent Circulators' Affidavits and false signatures, which when challenged were withdrawn? Did Judge Friedman err in not allowing [objectors' lawyer] to present any evidence demonstrating a serious pattern of fraud and false Affidavits by the same circulators and not strike all the Nominating Petitions? Should all of the Nominating Petitions have been stricken due to the false notary, the extensive pattern of fraud and the false Affidavits, particularly when done with the knowledge and consent of the candidate and campaign manager?

2. Did Judge Friedman err in not allowing [objectors' lawyer] to present and question all the circulators on

---

**3.** The objectors also raised a third question concerning an award of costs, which is not relevant to this appeal.

the false and withdrawn Nominating Petitions and further question them on their knowledge of the criteria and requirements of a Circulator's circulation and Affidavit?

Although the questions are argumentative and conflated, they are essentially restatements of the objectors' position below: *i.e.,* the objectors challenge the Commonwealth Court's specific evidentiary rulings and its rejection of the "pattern of fraud" or "false-in-one, false-in-all" theory upon which their evidentiary proffer was made.

In my view, the objectors' claims properly failed for several reasons. First, when this appeal was decided, this Court had not embraced any form of the objectors' "pattern of fraud" or "false-in-one, false-in-all" theory of challenge to nomination petitions. Moreover, the lower court's decision was supported by existing caselaw and the Election Code, and the objectors' briefing in this Court was conclusory and largely unresponsive to the lower court's explanation of the reasons for its decision. Objectors' argument was long on theory, but short on authority, and marshaled nothing that suggested error in the decision below. Acceptance of the objectors' evidentiary arguments would have represented a significant departure from existing authority in this area of law, without a sufficiently convincing argument to support that departure.

Second, adoption and retroactive application of the objectors' novel "pattern of fraud" or "false-in-one, false-in-all" theory to this case would have been extremely disruptive and unfair. Assuming the objectors could make out their case upon remand, the consequence would have been to strike the candidate from the ballot. But, there was nothing in the governing statute or existing caselaw to put political candidates on notice that otherwise valid signatures, and an otherwise valid nomination petition, could be stricken, and the candidate removed from the ballot, premised on the objectors' extrapolation theory. Candidates for office in Pennsylvania commonly collect signatures well in excess of the minimum required, recognizing that some signatures may be invalid, precisely in the hope of avoiding challenges. *See, e.g., In re*

*Nomination Petition of Morrison–Wesley,* 946 A.2d 789 (Pa. Cmwlth.2008) (candidate filed approximately 2,000 signatures where 1,000 were required); *In re Petition to Set Aside Nomination of Fitzpatrick,* 822 A.2d 867 (Pa.Cmwlth.2003) (candidate filed approximately 1,500 signatures where 750 were required). Those candidates had no reason to believe their protective action could prove fatal to their candidacies. Even if it is assumed that the objectors' theory had logical or equitable merit—as the objectors essentially claimed in the absence of authority—and warranted an adjustment to the existing decisional law, there was good reason to apply that new rule or construction prospectively; thus, the appropriate mandate still was affirmance here.

Finally, our time for consideration was constrained, as in all election cases, and the governing presumption is in favor of ballot access. *See Flaherty,* 770 A.2d at 331 ("Where the court is not convinced that challenged signatures are other than genuine, the challenge is to be resolved in favor of the candidate."); *Petition of Cioppa,* 533 Pa. 564, 626 A.2d 146, 148 (1993) (Election Code "liberally construed so as not to deprive a candidate of the right to run for office or the voters of their right to elect a candidate of their choice."). In view of all these factors, the objectors' theory, however creative and novel, did not make a strong case for overturning the decision below, and indeed, our affirmance was unanimous.

### III.

The OIS goes much farther than the analysis above, appearing to approve a form of the objectors' "pattern of fraud" theory, but as described in Mr. Justice Saylor's Concurring Statement in *In re Payton,* 596 Pa. 469, 945 A.2d 162 (2008), a case decided after our *per curiam* mandate issued in the case *sub judice.* According to the OIS, a nomination petition may be stricken if it contains a sufficiently egregious false affidavit, and if the candidate personally affirmed intentional and knowing falsehoods designed to deceive the electorate. But, in the OIS, Justice McCaffery ultimately concludes that the theory it describes is of no avail to the objectors here because *Payton* is

distinguishable and the objectors failed to forward the same allegations and offer the same evidence as described in the *Payton* concurrence.

The excursion into this area is unnecessary. First, the *Payton* concurrence did not exist when we decided this case, and we did not affirm because we believed we were operating under, but distinguishing, the future and non-binding *Payton* concurrence. Second, as I further develop below, the parties did not argue this theory to us. And, third, since the OIS ultimately holds that the objectors waived the theory it outlines *sua sponte*, its excursion is pure *obiter dictum*. In short, rather than explaining the grounds for our decision in 2008, the OIS would fashion a prospective new rule.

As a jurisprudential matter, I have no fixed objection to the Court attempting to square this pre-*Payton* decision with the *Payton* concurrence, or with a more global view of the relevant issues, as the Court comes to a better understanding of their complexities. The value in such an effort is to provide broader guidance. Also, as I have outlined above, as a general matter a prospective rule can be less disruptive in the election arena. (Unfortunately, because the OIS ignores issues raised by the objectors in favor of drawing on the *Payton* concurrence, the OIS outlines a proposed prospective rule unrelated to the present appeal and through a waiver finding, which also raises the problem that the entire effort is *dicta*.) But, I believe our decisional explanation should and can be more closely tied to the arguments that were actually presented by the parties.[4]

## IV.

In addition to explaining my own distinct reasons for supporting the Court's prior mandate, I also write briefly to note

4. In a separate concurrence, Mr. Justice Eakin questions the necessity of the exchange between the authors of the different expressions in this case, suggesting that it is for the General Assembly to legitimize the "false-in-one, false-in-all" theory as a ground for striking the nomination petitions of electoral candidates. But, as posed, the objectors' claim is a theory of evidence fully within this Court's bailiwick. In my view, a proper explanation for our decision requires close attention to the parties' actual arguments and the evidentiary theory as posed.

my disagreement with several aspects of the OIS expression. In my view, the OIS strays significantly from the parties' arguments, the factual record, and the law.

First, the objectors here presented a single narrow theory: non-withdrawn pages of a certain circulator or notary must be stricken for fraud based solely on evidence that the candidate had withdrawn a page signed by the circulator or notary. The OIS does not pass in any clear fashion upon the validity of the objectors' theory. Instead, the OIS ventures into issues of candidate impropriety, which was not a basis for the objectors' appeal to this Court.

Second, the objectors argued their extrapolation theory on the assumption that the withdrawn pages were part of a "pattern of fraud," that is, they were fraudulent. The OIS fails to correct this assumption, apparently conflating withdrawn signatures with invalid signatures and then making the leap to fraud. But, withdrawn signatures are not of-record. Deeming merely withdrawn signatures to be invalid, as the OIS does, is contrary to the Election Code's presumption of signature validity and effectively—and impermissibly—shifts the burden of proof from the objectors to the candidate. *See* 25 P.S. § 2937. Also, the policy of deeming withdrawn signatures invalid will likely have the undesirable effect of discouraging evidentiary stipulations and other efficiencies in election disputes. Election contests take place within narrow time-frames; withdrawing unneeded signatures by stipulation or otherwise, so as to narrow contested issues, is a salutary practice that considerably eases the burden on candidates, objectors, and the courts. *See, e.g., In re Nader,* 865 A.2d 8, 12–14 (Pa.Cmwlth.2004), *aff'd,* 580 Pa. 134, 860 A.2d 1 (2004) (*per curiam* ) (describing Commonwealth Court's administrative difficulties in screening candidate's individual signatures absent stipulations).

But, even assuming that merely withdrawn signatures can be deemed defective, there is no support in the record for concluding that the withdrawn signatures in this case were fraudulent. *See* OIS at 9 ("we now hold that allegations and evidence of **fraud** may be material to the determination of the

validity of a nomination petition") (emphasis added).[5] The Commonwealth Court made no finding of fact to that effect and, at most, the objectors conceded that the withdrawn signatures were technically defective under a strict application of *Flaherty*. *See Flaherty*, 770 A.2d at 336–37 (signature invalid if circulator who affirmed page was not present when elector signed). The sort of technical defect noted in *Flaherty*, on its own, would not warrant a characterization as "fraud." Further, it is speculative to assume that the cumulative effect of technically defective signatures equates to fraud with respect to the entire nomination petition. The OIS, nonetheless, accepts the objectors' description of the withdrawn signatures as fraudulent, with the result of distorting the factual record.

Finally, I respectfully disagree with the OIS that *Nader, Payton*, and *Citizens Committee to Recall Rizzo v. Bd. of Elections*, 470 Pa. 1, 367 A.2d 232, 241 (1976) are particularly helpful in explaining our decision of the narrow evidentiary issue that was decided in this case.

Justice SAYLOR, concurring.

I agree with the central propositions advanced by the Opinion in Support of *Per Curiam* Order ("OIS"), that evidence of widespread fraud in the collection of signatures may be relevant in an election challenge, *see In re Payton*, 596 Pa. 469, 470–72, 945 A.2d 162, 163–64 (2008) (Saylor, J., concurring), but that, as a general matter, an objector cannot prevail in a "global" challenge on the basis of such evidence without pleading and proving that the candidate, or possibly his cam-

---

5. It is unclear whether this prospective rule fashioned by the OIS means that "allegations and evidence of fraud," presumably with respect to the withdrawn signatures, alone prove that otherwise unchallenged signatures are fraudulent, as the objectors claim. If, indeed, that is the prospective rule that the OIS would adopt, I note that it deeply discounts the value of those otherwise unchallenged signatures and of those respective "voters' right to elect the candidate of their choice." *In re Nomination Petition of Driscoll*, 577 Pa. 501, 847 A.2d 44, 49 (2004); *In re Nomination Petition of Flaherty*, 564 Pa. 671, 770 A.2d 327, 331 (2001); *see also Lubin v. Panish*, 415 U.S. 709, 715–16, 94 S.Ct. 1315, 39 L.Ed.2d 702 (1974).

paign, was aware of or condoned the fraud. I also agree with Mr. Chief Justice Castille, that Appellants' novel false-in-one-false-in-all theory, as presented to the Commonwealth Court, was appropriately rejected by that court, and further, that any present expression by this Court beyond an affirmance of that ruling represents *dicta*. *See, e.g., In re Farnese*, 945 A.2d 274, 276, 277 (Pa.Cmwlth.2008) (single-judge opinion by Friedman, J.) (reciting Appellants' concession that their challenge depends upon acceptance of their false-in-one-false-in-all theory). I write separately, moreover, because I believe the OIS's reliance on the Commonwealth Court's decision in *In re Nomination Paper of Nader*, 865 A.2d 8 (Pa.Cmwlth.), *aff'd*, 580 Pa. 134, 860 A.2d 1 (2004) (*per curiam*), is misplaced, for several reasons.

First, it should be noted that, in the *Nader* matter, after the Commonwealth Court completed its review, it determined that the candidate lacked sufficient signatures to obtain ballot access. *See Nader*, 865 A.2d at 18. It was on that basis that the Commonwealth Court adjudicated the case, and this Court elected not to express any opinion concerning the court's reasoning. Accordingly, no legal issue was presented, either before the Commonwealth Court, or before this Court, concerning whether evidence of fraud imputable to the candidate was germane to a challenge of circulator petitions that might otherwise be deemed valid.

Additionally, there is no indication in *Nader* that the candidate agreed that a substantial percentage of signatures were not obtained in accordance with law. Accordingly, I cannot agree that *Nader* supports the principle that, where a candidate agrees that a large percentage of the signatures are invalid, evidence of fraud in the signature-gathering process is relevant beyond the actual signatures being challenged as fraudulent. *See* OIS, *slip op.* at 6 ("Where, as here, a candidate for office has agreed that 60.5% of the signatures contained in his nomination petition are invalid, and the objectors to the petition have asserted fraud in the signature procurement process and are prepared to support those allegations with evidence, we cannot say, in light of *Nader*, ...

that the evidence would be immaterial to the disposition of the petition."). In short, I believe that *Nader* has little relevance to the present case.

To me, the primary issue in *Nader* pertained to whether the term "qualified elector" subsumed a voter registration requirement, because if no such requirement existed, then the candidate would have had enough signatures for ballot access. *See Nader*, 580 Pa. at 146, 860 A.2d at 8 (Saylor, J., dissenting). As noted, since the Commonwealth Court's order was affirmed without an opinion, this Court did not issue a holding on that question. Moreover, review of the tabulated information provided by the Commonwealth Court demonstrates that only a little over one percent of the more than 50,000 signatures obtained were forged. As I stated then:

> In the consolidated findings, opinion and order, the Commonwealth Court also indicated that the signatures under review were primarily the result of widespread, systemic fraudulent conduct on the part the individuals gathering them. *See* [*Nader*, 865 A.2d at 18] (stating that "this signature gathering process was the most deceitful and fraudulent exercise ever perpetrated upon this Court"). A review of the tables and exhibits attached to the order, however, suggest that the problem was of a more limited scale (for example, 687 signatures out of 51,273 reviewed— or approximately 1.3% of the signatures—were rejected on the basis of having been forged). Moreover, the Commonwealth Court cited no evidence that the candidates were specifically aware of fraud or misrepresentation at the time of their submissions, and the candidates note—and the objectors do not dispute—that when they became aware of any fraudulent conduct connected with specific signatures, they voluntarily withdrew those signatures from consideration.

*Id.* at 146–47 n. 13, 860 A.2d at 8 n. 13. In summary, I do not support the continued collateral commentary on the *Nader* case, particularly where, as here, it is immaterial.

Justice EAKIN, concurring.

My colleagues agree that more than 500 signatures remained unaffected by appellants' challenge. Farnese, therefore, was properly retained on the ballot. I agree. Beyond that, I refrain from engaging in any discussion concerning the objectors' extrapolation theory.

The principles on which this matter turns are not unique to election law—the case turns on principles of evidence and not on recitation of electoral law distinctions. Appellants contend there was so much fraud in the withdrawn and disallowed signatures that one must conclude there was fraud in the remaining ones. The court below deemed fraud irrelevant, which is reasonable if one merely counts the signatures not assailed individually, to see if they total 500.

Fraud, however, is relevant, though not in the "global sense" appellants would have. When one circulator is found to have committed significant fraud, this may affect the finder of fact's assessment of the credibility of other acts or affidavits by the same circulator in the same election. Conversely, there may be reasons not to disregard or reject such other acts or affidavits. It is largely a question of fact, which in the end is not for this Court to second guess, so long as the record and reasoning below support the finding. *See In re Nomination of Flaherty*, 564 Pa. 671, 770 A.2d 327, 331 (2001) (standard of review is whether findings of fact are supported by substantial evidence, whether there was an abuse of discretion, or whether errors of law were committed).

Furthermore, I continue to agree that a "false in one, false in all" principle should be rejected in these cases, *see, e.g., In re Payton*, 596 Pa. 469, 945 A.2d 162, 163 (2008) (plurality); if that is to be the law, it is for the legislature to accomplish. Short of that, a fact-finder should not be made to artificially ignore significant fraud when assessing the credibility of any witness, circulator, or signator; fraud should not be a presumptive total disqualification, but a permissible consideration.

I therefore concur in the result.

Justice BAER joins this concurring opinion.